**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

Turtle Island Foods, SPC, doing business as
The Tofurky Company

                                      *Plaintiff*,

v.                                                                   Case No. 4:19-cv-514-KGB

Nikhil Soman, in his official capacity as Director
of the Arkansas Bureau of Standards

                                      *Defendant*.

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

The question in this case is whether the government can prohibit companies from using terms like "veggie burger" or "tofu hot dog" to describe their products. The law at issue, Arkansas Act 501, prohibits companies from using words like "meat," "burger," "sausage," and "deli slice" to describe food products that are not made from slaughtered animals, even if the companies clearly and accurately inform consumers about the nature of their products. The law's stated purpose is to prevent consumer confusion, but there is no evidence in the legislative record that consumers are confused about whether a veggie burger comes from a cow. To the contrary, people buy plant-based meats precisely because they are *not* made from slaughtered animals. Far from preventing consumer deception, the law is more likely to create consumer confusion by prohibiting companies from continuing to use self-evident terms like "vegan sausage" to accurately describe the taste, appearance, and texture of their products. The law's tendency to confuse, rather than inform, is no accident; the legislative history reveals that the law's true

1

purpose is to benefit the meat industry by censoring the competition. When the government censors commercial speech in order to pick winners and losers in the marketplace, it disserves its constituents and violates the First Amendment. Because Act 501 is hopelessly unconstitutional, it must be immediately enjoined.

## BACKGROUND

In response to vigorous lobbying from the agriculture industry, Arkansas recently passed Act 501, Ark. Code Ann. § 2-1-301 *et seq.*[1] The Act makes it illegal for any person to:

> misbrand or misrepresent an agricultural product that is edible by humans, including without limitation, by . . .
>
> (2) Selling the agricultural product under the name of another food;
>
> . . .
>
> (5) Representing the agricultural product as a food for which a definition and standard of identity has been provided by regulations under 20-56-219 or by the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq., as it existed on January 1, 2019, unless: (A) The agricultural product conforms to the definition and standard; and (B) The label of the agricultural product bears the name of the food specified in the definition and standard and includes the common names of optional ingredients other than spices, flavoring, and coloring present in the food regulations require;
>
> (6) Representing the agricultural product as meat or a meat product when the agricultural product is not derived from harvested livestock, poultry, or cervids;
>
> . . .
>
> (8) Representing the agricultural product as beef or a beef product when the agricultural product is not derived from a domesticated bovine;
>
> (9) Representing the agricultural product as pork or a pork product when the agricultural product is not derived from a domesticated swine;
>
> (10) Utilizing a term that is the same as or similar to a term that has been used or defined historically in reference to a specific agricultural product.

---

[1] *See* Nathan Owens, *Truth in Labeling Inked by Governor*, Ark. Democrat Gazette, Mar. 20, 2019, https://bit.ly/2K6ck00.

Ark. Code Ann. § 2-1-305. [2]

Defendant Nikhil Soman, in his official capacity as the Director of the Arkansas Bureau of Standards (the "State"), is charged with enforcing the Act. *Id.* § 2-1-304. Each item that violates the Act is punishable by a civil penalty of up to $1,000. *Id.* § 2-1-306.

Plaintiff Turtle Island Foods, SPC, doing business as The Tofurky Company ("Tofurky"), is one of many companies selling plant-based meat products in stores throughout the country, including Arkansas. Declaration of Jaime Athos, Tofurky President and CEO ¶¶ 3, 9 (Aug. 13, 2019), filed as Plaintiff's Exhibit 1. Plant-based meats are foods that approximate the texture, flavor, and appearance of meat derived from slaughtered animals. *Id.* ¶ 3. They are typically made from soy, wheat, jackfruit, textured vegetable protein, or other vegan ingredients. *Id.* Similar to other plant-based meat producers, Tofurky's packaging and marketing materials—which use terms like "chorizo," "hot dogs," and "ham roast" to effectively describe its products—all clearly indicate that these products are plant based, meatless, vegetarian, or vegan. *Id.* ¶ 5, attachment. Tofurky's products already comply with federal food labeling regulations and numerous state and federal consumer protection laws, which prohibit the deceptive labeling and marketing of food products and consumer products more generally. *Id.* ¶ 12.

Now, however, Tofurky must either completely overhaul its labeling and marketing practices to comply with the Act's restrictions on truthful and non-misleading commercial

---

[2] The Act defines "meat" as "a portion of a livestock, poultry, or cervid carcass that is edible by humans," and expressly excludes "synthetic product derived from a plant, insect, or other source," and "product grown in a laboratory from animal cells." *Id.* § 2-1-302(7). It defines "meat product" as "an agricultural product that is edible by humans and made wholly or in part from meat or another portion of a livestock, poultry, or cervid carcass." *Id.* § 2-1-302(8). The Act includes similar definitions for beef, beef product, pork, pork product, and poultry. *Id.* §§ 2-1-302(2), (3), (12), (13), (14).

speech, or face the threat of ruinous civil penalties. *Id.* ¶ 16. Tofurky seeks a preliminary injunction to prevent irreparable harm to its constitutional rights.

## ARGUMENT

In deciding whether to issue a preliminary injunction, courts in the Eighth Circuit consider the four factors articulated in *Dataphase Systems, Inc. v. C L Systems, Inc.*: (1) the probability that the plaintiff will prevail on the merits; (2) whether the plaintiff faces a threat of irreparable harm if injunctive relief is not granted; (3) the balance between the harm the plaintiff faces and the injury that the injunction's issuance would inflict upon the defendant; and (4) the public interest. 640 F.2d 109, 114 (8th Cir. 1981) (en banc); *accord Sparkman Learning Ctr.v. Ark. Dep't of Human Servs.*, 775 F.3d 993, 997 (8th Cir. 2014). Each of these factors weighs in favor of Tofurky's request for a preliminary injunction.

**I.      Tofurky will succeed on the merits of its constitutional claims.**

In order to obtain a preliminary injunction against a state law, the movant must demonstrate that it is likely to prevail on the merits of its claims. *Planned Parenthood of Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732–33 (8th Cir. 2008) (en banc). In this case, Tofurky is likely to succeed on at least two of its claims. First, Act 501 unconstitutionally restricts Tofurky's truthful and non-misleading commercial speech in violation of the First Amendment. Second, the Act's prohibitions on speech are unconstitutionally vague. A likelihood of success on either of these claims would warrant a preliminary injunction.[3]

**A. Tofurky will succeed on its First Amendment claim.**

Act 501 unconstitutionally restricts protected commercial speech. It directly regulates the labeling and marketing of commercial products by prohibiting Tofurky, and similarly situated

---

[3] Tofurky has also alleged that the Act violates the dormant Commerce Clause, but does not seek preliminary relief on that claim.

companies, from continuing to use words like "beef," "roast," and "sausage" in connection with food products that do not come from slaughtered animals. The law also prohibits Tofurky from truthfully depicting its products if they resemble food associated with meat from slaughtered animals. Ark. Code Ann. § 2-1-302(10) (defining "misrepresent" as "any untrue, misleading, or deceptive oral or written statement, advertising, label, display, picture, illustration, or sample"). The labeling and marketing of commercial products is commercial speech. *See, e.g.*, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 495–99 (1996); *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 481 (1995). And it is well-established that such speech is protected under the First Amendment:

> Advertising, however tasteless and excessive it sometimes may seem, is nonetheless dissemination of information as to who is producing and selling what product, for what reason, and at what price. So long as we preserve a predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private economic decisions. It is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed. To this end, the free flow of commercial information is indispensable. And if it is indispensable to the proper allocation of resources in a free enterprise system, it is also indispensable to the formation of intelligent opinions as to how that system ought to be regulated or altered.

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976) (citations omitted).

Restrictions on commercial speech are evaluated under the framework announced in *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980). *Central Hudson* requires courts to determine, as a threshold matter, whether the commercial speech at issue is protected under the First Amendment. *Id.* at 563–64. If the speech is protected, the restriction may be upheld only if: (1) the government has a substantial interest in suppressing the speech; (2) the restriction directly and materially advances the government's interest; and (3) the restriction on speech is no more extensive than necessary to advance the government's

interest. *Id.* at 564. "With respect to both the threshold question and the three-prong test, the burden is on the government to produce evidence to support its restriction." *Ocheesee Creamery LLC v. Putnam*, 851 F.3d 1228, 1236 (11th Cir. 2017) (citing *Edenfield v. Fane*, 507 U.S. 761, 770 (1993)). That burden is "not slight." *Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*, 512 U.S. 136, 143 (1994) (citation omitted).

### 1. Act 501 restricts commercial speech protected by the First Amendment.

First, the Court must determine whether the commercial speech restricted by Act 501 is protected under the First Amendment. To succeed at this threshold stage, the State must demonstrate that the speech at issue either "concerns unlawful activity" or is false or "inherently misleading." *See, e.g.*, *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1056 (8th Cir. 2014). The only question in this case is whether the commercial speech regulated by the Act is false or inherently misleading.

Speech is "inherently" misleading only if it is "'inevitably . . . misleading' to consumers." *1-800-411-Pain*, 744 F.3d at 1056 (quoting *Bates v. State Bar of Ariz.*, 433 U.S. 350, 372 (1977)). This is a high bar. In *Pearson v. Shalala*, for instance, the government argued that health claims about dietary supplements were inherently misleading because they lacked "significant scientific agreement" and would have "such an awesome impact" that it would be "virtually impossible" for consumers to exercise independent judgment at the point of sale. 164 F.3d 650, 655 (D.C. Cir. 1999). The court held that this argument was "almost frivolous" because it was based on the paternalistic assumption that consumers are "hypnotized" by health claims to the point that "they are bound to be misled." *Id.* (citing *Peel v. Att'y Registration & Disciplinary Comm'n*, 496 U.S. 91, 105 (1990)).

Here, the State cannot plausibly maintain that any use of words like "meat," "burger," or "steak" on plant-based food labels is inherently misleading. For decades—and in some cases centuries—these words have been used to describe foods that are not made from slaughtered animals, such as coconut meat, veggie burgers, and beefsteak tomatoes.[4] Context is relevant, and purveyors of plant-based meats routinely make clear that their products are not made from slaughtered animals. For example, Tofurky's labels and marketing materials prominently identify its products variously as "all vegan," "plant based," "vegetarian," "veggie," and "made with pasture raised plants" on the front of its products packages. Ex. 1 ¶ 5, attachment. It would be absurdly patronizing to suggest that terms like "plant-based sausage" or "vegetarian ham roast" inherently mislead consumers. As the court explained in *Ang v. Whitewave Foods Co.*:

> [Allegations] that a reasonable consumer would view the terms 'soymilk' and 'almond milk,' disregard the first words in the names, and assume that the beverages came from cows. . . . stretches the bounds of credulity. Under Plaintiffs' logic, a reasonable consumer might also believe that veggie bacon contains pork, that flourless chocolate cake contains flour, or that e-books are made out of paper.

2013 WL 649 2353, at *4 (N.D. Cal. Dec. 10, 2013).[5]

### 2. Act 501 does not advance a substantial government interest.

The State must therefore demonstrate that Act 501 advances a substantial government interest and that it is no more restrictive than necessary to sustain the asserted interest. The Act's

---

[4] *See* Merriam-Webster, *Flexible Words for Your Favorite Foods*, Jul. 12, 2019, https://bit.ly/334HXi7. *See also e.g.*, *Genesis* 1:29 (King James) ("And God said, Behold I have given you every herb bearing seed, which is upon the face of all the earth, and every tree, in which is the fruit of a tree yielding seed; to you it shall be for meat."); Food & Drug Admin., *Guidance for Industry on Reference Amounts Customarily Consumed* 27 (2018), https://bit.ly/2JFvGrj ("Coconut concentrate is an extract of the cooked mixture of water and coconut meat . . .").

[5] Although "[i]t is undoubtedly true that a state can propose a definition for a given term," that does not mean that "any use of the term inconsistent with the state's preferred definition is inherently misleading." *Ocheesee Creamery*, 851 F.3d at 1238. "Such a per se rule would eviscerate *Central Hudson*." *Id.*

*ostensible* purpose is to "protect consumers from being misled or confused by false or misleading labeling of agricultural products that are edible by humans." Ark. Code Ann. 2-1-301. But the Act's restrictions on commercial speech do not directly and materially prevent any genuine consumer confusion. This prong of the *Central Hudson* test is "not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 770–71. In particular, the Supreme Court has made clear that "rote invocation of the words 'potentially misleading'" cannot "supplant the [government's] burden." *Ibanez*, 512 U.S. at 146 (quoting *Edenfield*, 507 U.S. at 771). *See, e.g.*, *Safelite Group, Inc. v. Rothman*, 229 F. Supp. 3d 859, 880–81 (D. Minn. 2017) (holding that the government must produce "empirical evidence" to demonstrate that consumer confusion or deception is a genuine problem).

Here, there is no evidence in the legislative record demonstrating that consumers are confused or deceived by labeling or marketing materials for plant-based meats. In fact, Tofurky clearly labels its products because its competitive advantage depends on informing consumers that its products are *not* made from animals. Ex. 1 ¶¶ 6, 7. *See Gitson v. Trader Joe's Co.*, 2015 WL 9121232, at *1 (N.D. Cal. Dec. 1, 2015) ("The reasonable consumer (indeed even the least sophisticated consumer) does not think soymilk comes from a cow. To the contrary, people drink soymilk in lieu of cow's milk."); *Painter v. Blue Diamond Growers*, 2017 WL 4766510, at *2 (C.D. Cal. May 24, 2017) (dismissing a misleading-advertising claim against an almond milk producer and commenting that "[n]o reasonable consumer could be misled by Defendant's unambiguous labeling or factually accurate nutritional statements"), *aff'd*, 757 F. App'x 517 (9th Cir. 2018).

8

Nor is there any evidence that prohibiting Tofurky and other plant-based meat purveyors from using meat-based terms will in fact alleviate consumer confusion to a material degree. Instead, Act 501 is likely to create consumer confusion where, for decades, none has existed. Consumers seek out plant-based meats as alternatives to products made from slaughtered animals. Tofurky relies on meat-based terms like "burger," "chick'n," and "sausage" to efficiently and effectively inform consumers about the taste, texture, and appearance of its products. Ex. 1 ¶ 22. The Act's restriction on the use of these terms will make it much more difficult for consumers to identify the plant-based meats they want to consume in lieu of meat from slaughtered animals. For example, Tofurky's "Plant-Based Original Italian Sausage" communicates that the product is made from plants and has the shape and seasonings commonly associated with sausage made from animal meat. The Act requires Tofurky to replace "sausage" with less descriptive terms like "roll" or "tube."[6] Consumers who confront a package that reads "plant-based protein" or "veggie tube" in the grocery store will have no idea what they are buying.

The Act's true purpose is not to protect consumers, but to stoke confusion in order to benefit the economic interests of the meat industry. It is no secret that agriculture industry advocates lobbied for the Act because they fear a decline in sales "as shoppers choose from a growing pantry of alternatives." Owens, *supra* n.1. The Arkansas Cattlemen's Association told legislators that the Act is necessary to protect the industry's "brand I.D." from "[c]ounterfeit products." Declaration of Marcus Onley, Good Food Institute Policy Coordinator ¶ 9 (Aug. 12,

---

[6] *See* Surveygoo, *One in Four Consumers Supports a Ban on Meat-Related Names for Vegetarian Products*, https://bit.ly/32XwNLX.

2019), filed as Plaintiff's Exhibit 2.[7] And the Act's primary sponsor in the Arkansas House said that the legislation is designed "to protect the agricultural producers of our state." *Id.* ¶ 7.[8] But "meat" is a common English word, not the intellectual property of the Arkansas Cattlemen's Association. And economic protectionism cannot justify a restriction on protected speech. *See Safelite*, 229 F. Supp. 3d at 882 (stating that the "lack of evidence" showing consumer deception or confusion, "combined with [competitors'] aggressive lobbying . . . calls into question [the government's] purported interest in preventing consumer deception"). In short, the Act does not directly or materially advance any substantial government interest.

### 3. Act 501 is not appropriately tailored to any substantial government interest.

Finally, the government must demonstrate that its restriction on speech is "not more extensive than is necessary to serve [a substantial government] interest." *Central Hudson*, 447 U.S. at 566. In other words, Act 501 must be "reasonable" and "narrowly tailored to achieve the desired objective," *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001) (citation omitted), and it "cannot curtail substantially more speech than is necessary to accomplish its purpose," *Krantz v. City of Fort Smith*, 160 F.3d 1214, 1222 (8th Cir. 1998). A restriction on truthful commercial speech cannot survive *Central Hudson* scrutiny if there are "alternatives to the regulations that directly advance the asserted interest in a manner less intrusive to plaintiffs' First Amendment rights." *Mo. Broad. Ass'n v. Lacy*, 846 F.3d 295, 302 (8th Cir. 2017). In *Ocheesee Creamery,* for instance, the Eleventh Circuit held that a ban on the use of the term "skim milk"

---

[7] The video recordings from which Mr. Onley transcribed the statements included in his declaration are available on the DVD filed as Plaintiff's Exhibit 4.

[8] In a nod to the Act's restrictions on cauliflower rice labels (which are not at issue in this litigation), one of the Act's sponsors said, "I'm sure our senator colleagues from the delta are going to want to protect their rice farmers as do I." *Id.* ¶ 22.

for milk that does not contain vitamin A was far more extensive than necessary to serve its interest in combating consumer deception, because there were "numerous less burdensome alternatives," such as "allowing skim milk to be called what it is and merely requiring a disclosure that it lacks vitamin A." 851 F.3d at 1240 & n.13.

Here, even if the State could demonstrate that the Act directly and materially alleviated genuine consumer confusion regarding the nature of plant-based meats, the Act would still fail *Central Hudson* scrutiny because a blanket restriction on the use of meat-related terms is far more restrictive than necessary to address this supposed problem. Numerous state and federal laws, including the Arkansas Food, Drug, and Cosmetic Act (AFDCA), the Arkansas Deceptive Trade Practices Act (ADTPA), the federal Food, Drug, and Cosmetic Act (FDCA), and the Federal Trade Commission Act (FTCA) already prohibit mislabeling of food products and consumer products more generally. *See* Ark. Code Ann. § 20-56-209(1) (prohibiting the "false or misleading" labeling of food); Ark. Code Ann. § 4-88-107 (prohibiting "false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval or certification of goods or services"); 21 U.S.C. § 343(a)(1) (stating that a food product is unlawfully "misbranded" if "its labeling is false or misleading in any particular"); 15 U.S.C. § 45(a)(1) (prohibiting "unfair or deceptive practices" in or affecting commerce).

These authorities provide robust enforcement mechanisms to address any individual instances of deceptive or misleading labeling or marketing that might arise. There has been "no showing" that state and federal officials, as well as private attorneys general, "cannot police deceptive practices effectively" under these existing laws. *Peel*, 496 U.S. at 109; *see also City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993) ("[I]f there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is

certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable."). And yet, the Act ignores these well-established authorities in favor of a new restriction on speech. This blunderbuss approach is actually detrimental to consumers, as the Federal Trade Commission itself noted in comments to the federal Food and Drug Administration:

> [C]onsumer protection agencies often must choose between the risk of allowing commercial speech that might prove to be false or misleading and the risk of banning commercial speech that might prove to be true. . . . Available evidence suggests . . . that the general benefits of an enforcement approach that encourages dissemination of truthful information, while vigorously attacking misleading claims when they occur, produces benefits for consumers.

*FTC Staff Provides the FDA with Comments on First Amendment Commercial Speech Doctrine*, 2002 WL 31106156.

In addition to pursuing enforcement actions under existing statutory authorities, Arkansas could have addressed any potential consumer confusion by imposing specific disclosure requirements. Commercial disclosure requirements are generally considered "constitutionally preferable to outright suppression." *Pearson*, 164 F.3d at 657; *see also Central Hudson*, 447 U.S. at 571 (suggesting that requiring a company to include more detailed information on its advertisements is a legitimate and less restrictive alternative to an outright ban); *Ocheesee Creamery*, 851 F.3d at 1240 & n.13. Of course, statutory disclosure requirements would be largely superfluous in this case because, in addition to listing their products' ingredients, plant-based meat purveyors already prominently identify their products as plant-based alternatives to meat from slaughtered animals. Ex. 1 ¶¶ 4–8, attachment. This leads back to the inescapable conclusion that Act 501 is not really meant to alleviate consumer confusion at all, but is rather intended to penalize plant-based meat purveyors (and, indirectly, consumers) by preventing the

dissemination of truthful, non-misleading commercial speech. The Act therefore violates the First Amendment.

### B. Tofurky will succeed on its vagueness claim.

Act 501 also violates the Fourteenth Amendment Due Process Clause's prohibition against vague statutes. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see also, e.g.*, *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997). "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *City of Chicago v. Morales*, 527 U.S. 41, 56– 67 (1999)). Laws regulating speech are subject to a "more stringent vagueness test" than laws regulating conduct. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 604 (1967) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)); *see also, e.g.*, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012).

Several of the Act's prohibitions are entirely opaque. For example, Act 501's prohibition on the use of any "term that is the same as or similar to a term that has been used or defined historically in reference to a specific agricultural product," Ark. Code Ann. § 2-1-305(10), provides absolutely no guidance to companies regarding what terms are actually prohibited under the Act. Many terms, for instance, are commonly used to refer to multiple specific agricultural products. For instance, the Act defines "meat" as "a portion of a livestock, poultry, or cervid

13

carcass that is edible by humans," Ark. Code Ann. § 2-1-302(7)(A), but—in sources ranging from the King James Bible to FDA guidance documents—the word "meat" is also often used to refer to the flesh of fruits or nuts. Merriam-Webster, *supra* n.4. The word "patty" is often associated with hamburgers, but it is also used to refer to any small, flat cake of food (e.g., peppermint patties). The word "burger" traditionally referred to a sandwich made from a patty of ground beef, but since the 1930s has been used to describe all sorts of sandwiches, including nut burgers, fish burgers, turkey burgers, and veggie burgers. *Id.* And the word "steak" can refer to "a slice of meat cut from a fleshy part of a beef carcass," or to "edible portions of other animals, and occasionally to non-animalian food." *Id.* Is Tofurky no longer allowed to use these words in connection with its products?

To make matters even more confusing, the Act prohibits the use of terms "similar" to those historically used in reference to specific agricultural products. Does the Act prohibit "beetballs" because it is similar to "meatballs"? Is Tofurky prohibited from using its own registered trademark in Arkansas because it is "similar" to the word "turkey"? The fact that such "questions . . . so readily come to mind means that it is not sufficiently clear to a manufacturer or distributor of ordinary intelligence, what exactly the statute prohibits." *Ass'n of Nat'l Advertisers, Inc. v. Lungren*, 809 F. Supp. 747, 762 (N.D. Cal. 1992), *aff'd*, 44 F.3d 726 (9th Cir. 1994). It also means that the State has nearly unfettered discretion to make up the rules as it goes along. These are precisely the concerns that vagueness doctrine is meant to address. *See Sessions v. Dimaya*, 138 S. Ct. 1204, 1232 (2018) (Gorsuch, J., concurring).[9]

---

[9] Other prohibitions suffer from similar defects. For instance, it is impossible to tell what it means to sell an agricultural product "under the name of another food" or to represent an agricultural product "as a food for which a definition and standard of identity has been provided." Ark. Code Ann. §§ 2-1-305(2), (5). Does almond milk violate these prohibitions? *See* 21 C.F.R. § 131.110 (standard of identity for milk). How about peanut butter? *Compare* 21

14

**II.    The other *Dataphase* factors support injunctive relief.**

"In a First Amendment case . . . the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue." *Phelps-Roper v. Nixon*, 509 F.3d 480, 485 (8th Cir. 2007), *modified on reh'g*, 545 F.3d 685 (8th Cir. 2008). Even considered individually, however, the three remaining *Dataphase* factors support injunctive relief.

The second *Dataphase* factor involves the likelihood of irreparable injury absent an injunction. 640 F.2d at 112. A restriction on First Amendment rights "unquestionably" constitutes irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Phelps-Roper*, 509 F.3d at 485 ("If [appellant] can establish a substantial likelihood of success on the merits of her First Amendment claim, she will also have established irreparable harm as the result of the deprivation."). Even if it did not, the State's sovereign immunity under the Eleventh Amendment prevents Tofurky from recovering damages suffered as a result of the Act. *See Burk v. Beene*, 948 F.2d 489, 492–93 (8th Cir. 1991) (holding that Arkansas has not consented to be sued in federal court); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66–67 (1989) (holding that 42 U.S.C. § 1983 does not abrogate states' sovereign immunity). The application of Eleventh Amendment sovereign immunity to bar Tofurky's damages claim also constitutes irreparable harm as a matter of law. *Baker Elec. Co-op, Inc.* v. *Chaske*, 28 F.3d 1466, 1472–73 (8th Cir. 1994).

"The third *Dataphase* factor requires a district court to consider the balance between the harm to the movant and the injury that granting the injunction will inflict on other interested

---

C.F.R. § 101.67 (standard of identity for butter) *with* 21 C.F.R. § 164.150 (standard of identity for peanut butter).

parties." *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 489 (8th Cir. 1993) (citing *Dataphase*, 640 F.2d at 114). The harms caused to Tofurky by Act 501 significantly outweigh the burden an injunction would place on the State or the public. Compliance with the Act would have a severe detrimental impact on Tofurky. Ex. 1 ¶¶ 16–24. Tofurky has invested significant resources in marketing and packaging its products in truthful and non-deceptive ways. *Id.* ¶ 11. Now, the Act requires Tofurky to (1) risk massive civil penalties by continuing its current marketing and packaging practices; (2) create specialized marketing and packaging practices for Arkansas, including attempting to police spillover from marketing in nearby states; (3) change its marketing and packaging practices nationwide; or (4) refrain from marketing or selling its products in Arkansas at all. *Id.* ¶ 16. Each of these options—some of which may be impossible as a practical matter—significantly burdens Tofurky's commercial speech rights for no legitimate reason. Even if Tofurky goes to the trouble of revamping its packaging and marketing to comply with the Act, it would still run the risk of disastrous civil penalties under the Act's inherently vague prohibitions.

In addition to this constitutional harm, Tofurky faces tangible market disadvantages as a result of the Statute. For instance, if Tofurky attempts to comply with the Statute but continues to advertise and market its plant-based meats in other states, it may nonetheless face civil penalties for packaging and marketing that spills into Arkansas markets. *Id.* ¶¶ 18, 21. In addition, retail chains that operate both in Arkansas and other states are less likely to carry Tofurky's products if they cannot do so in all of their stores. *Id.* ¶ 20. Customers may become frustrated about the unavailability of Tofurky's products in Arkansas or puzzled about why Tofurky's products are marketed and packaged differently. *Id.* ¶¶ 22, 23. Given the total absence of evidence that

consumers are confused by the marketing or packaging of Tofurky's (or other companies') plant-based meat products, there is no discernable harm to weigh against the injunction.

Finally, the fourth *Dataphase* factor considers the public interest. Violations of constitutional rights are irreparable injuries, and it is always in the public interest to protect those rights. *Phelps-Roper*, 509 F.3d at 485; *accord Rounds*, 530 F.3d at 752. Arkansas consumers will also benefit from the free flow of truthful and non-misleading commercial information allowing them to identify plant-based options for their favorite meals.

## CONCLUSION

For the foregoing reasons, the Court should grant Tofurky's motion for a preliminary injunction.

Respectfully submitted,

Jeff Priebe (AR 2001124)
James, Carter & Priebe, LLP
500 Broadway, Suite 400
Little Rock, Arkansas 72201
Email: jpriebe@jamescarterlaw.com
Tel 501.372.1414; Fax 501.372.1659

*On behalf of the Arkansas Civil Liberties Union Foundation, Inc.*

Brian Hauss*
American Civil Liberties
  Union Foundation
Speech, Privacy & Technology Project
125 Broad Street, 18th Floor
New York, NY 10004
Email: bhauss@aclu.org
Phone: 212.549.2500

Matthew Liebman*
Amanda M. Howell*
Animal Legal Defense Fund
525 E. Cotati Ave.
Cotati, California 94931
Email: ahowell@aldf.org
Phone: 707.795.2533

Jessica Almy*
Nicole Manu*
The Good Food Institute
1380 Monroe St. NW #229
Washington, DC 20010
Email: jessicaa@gfi.org
Phone: 866.849.4457

* *Pro hac vice* motions pending

*Counsel for Plaintiff*