## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**TURTLE ISLAND FOODS SPC**                                                  **PLAINTIFF**
**d/b/a TOFURKY COMPANY**

**v.**                                   **Case No. 4:19-cv-00514-KGB**

**NIKHIL SOMAN in his official capacity**
**as Director of the Arkansas Bureau of Standards**                    **DEFENDANT**

## PRELIMINARY INJUNCTION ORDER

Before the Court is a motion for preliminary injunction filed by plaintiff Turtle Island

Foods SPC, d/b/a The Tofurky Company ("Tofurky") (Dkt. No. 14).  Defendant Nikhil Soman, in

his official capacity as Director of the Arkansas Bureau of Standards ("the State"), responded in

opposition (Dkt. No. 17).  On October 7, 2019, the Court conducted a hearing regarding this motion

(Dkt. No. 23).

Tofurky brings this action seeking declaratory and injunctive relief under 42 U.S.C. § 1983

to challenge the constitutionality of Arkansas Act 501, Arkansas Code Annotated § 2-1-301, *et

seq.* ("Act 501") (Dkt. Nos. 1, ¶¶ 1, 3; 14, at 1).  Specifically, Tofurky challenges six provisions

from Act 501:  Arkansas Code Annotated §§ 2-1-305(2), (5), (6), (8), (9), and (10) (Dkt. No. 14,

at 1).  Tofurky asserts that these provisions represent a restriction on commercial speech that

prevents companies from sharing truthful and non-misleading information about their products,

does nothing to protect the public from potentially misleading information, and creates consumer

confusion where none existed before in order to impede competition (Dkt. No 1, ¶ 2).  As such,

Tofurky claims that Act 501 violates the Free Speech Clause of the First Amendment, the Due

Process Clause of the Fourteenth Amendment, and the dormant Commerce Clause (*Id.*).[1]  Tofurky alleges that Act 501 is unconstitutional on its face and as applied (*Id.*, ¶ 3).  Tofurky seeks a preliminary injunction prohibiting the State from enforcing the challenged provisions of Act 501 (Dkt. No. 14, at 1).  For the following reasons, the Court grants Tofurky's motion for preliminary injunction.

## I.     Procedural Background

Tofurky filed its complaint on July 22, 2019 (Dkt. No. 1).  Act 501 took effect on July 24, 2019.  *See* Ark. Code Ann. § 2-1-305.  The State filed its answer to Tofurky's complaint on August 13, 2019 (Dkt. No. 13).  Though the complaint mentions a motion for a preliminary injunction (Dkt. No. 1, at 17), Tofurky separately moved for preliminary injunction on August 14, 2019 (Dkt. No. 14).  Along with its motion for preliminary injunction, Tofurky included a declaration from Jamie Athos, president and Chief Executive Officer of Tofurky; a declaration from Marcus Onley, Policy Coordinator at The Good Food Institute; a declaration from Candice Misenheimer, a legal assistant at the law firm of James, Carter & Priebe, LLP; and a brief in support of the motion (Dkt. Nos. 14-1, 14-2, 14-3, 15).  The State filed a response in opposition to Tofurky's motion for preliminary injunction on August 22, 2019 (Dkt. No. 17).  Along with its response in opposition, the State included a copy of Act 501 and a declaration from Mr. Soman (Dkt. Nos. 17-1, 17-2).  The following facts are taken from these documents.  Although the Court conducted a hearing on the motion, the parties presented only argument at that hearing, no additional evidence.

---

[1]  Although Tofurky alleges that Act 501 violates the dormant Commerce Clause, it does not seek preliminary relief on that claim (Dkt. No. 15, at 4 n.3).

## II.      Findings Of Fact

Tofurky is a social purpose corporation incorporated in the State of Washington and headquartered in Hood River, Oregon (Dkt. No. 1, ¶ 7).  Mr. Soman is the Director of the Arkansas Bureau of Standards ("the Bureau"), a division of the Arkansas Department of Agriculture (*Id.*, ¶ 10).  Tofurky develops, produces, markets, and sells plant-based food products, including plant-based meats (*Id.*, ¶ 9; Dkt. No. 14-1, ¶ 3).  Plant-based meats are typically made from soy, tempeh, wheat, jackfruit, textured vegetable protein, or other vegan ingredients (Dkt. No. 14-1, ¶ 3).  The texture, flavor, and appearance of plant-based meats resembles meat products made from slaughtered animals (*Id.*).  Unlike animal-based meats, however, plant-based meats are made from vegan ingredients (*Id.*).  The products are marketed and sold nationwide, including throughout Arkansas (*Id.*, ¶¶ 3, 9).  Tofurky is one of many companies selling plant-based food products in stores throughout the country, including Arkansas (Dkt. No. 15, at 3).

Tofurky uses traditional meat-based terms like "chorizo," "ham roast," and "hot dogs," alongside qualifiers like "all vegan," "plant based," "vegetarian," and "veggie," to show that its products are plant-based meats that can be served and consumed just like any other meats (Dkt. Nos. 14-1, ¶ 5; 17, at 2).  The dispute regarding Act 501 notwithstanding, Tofurky's products, including its plant-based meat products, comply with federal food labeling regulations as well as numerous state and federal laws that prohibit false and deceptive labeling and marketing for food products and consumer products more generally (Dkt. No. 14-1, ¶ 12).  Tofurky asserts that it cannot accurately and effectively describe its products without comparison to the conventional meat products with flavor profiles Tofurky's products are designed to invoke (Dkt. No. 1, ¶ 46).  Tofurky believes that its current packaging and marketing materials accurately convey the nature and contents of its plant-based meat products (Dkt. No. 14-1, ¶ 25).

As mentioned above, Act 501 took effect on July 24, 2019. *See* Ark. Code Ann. § 2-1-305.

In relevant part, Act 501 states:

> A person shall not misbrand or misrepresent an agricultural product that is edible by humans, including without limitation, by:
>
> . . .
>
> (2)  Selling the agricultural product under the name of another food;
>
> . . .
>
> (5)  Representing the agricultural product as a food for which a definition and standard of identity has been provided by regulations under § 20-56-219 or by the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq., as it existed on January 1, 2019, unless:
>
>> (A)    The agricultural product conforms to the definition and standard; and
>>
>> (B)    The label of the agricultural product bears the name of the food specified in the definition and standard and includes the common names of optional ingredients other than spices, flavoring, and coloring present in the food as regulations require;
>
> (6)  Representing the agricultural product as meat or a meat product when the agricultural product is not derived from harvested livestock, poultry, or cervids;
>
> . . .
>
> (8)  Representing the agricultural product as beef or a beef product when the agricultural product is not derived from a domesticated bovine;
>
> (9)  Representing the agricultural product as pork or a pork product when the agricultural product is not derived from a domesticated swine;
>
> (10)  Utilizing a term that is the same as or similar to a term that has been used or defined historically in reference to a specific agricultural product. . . .

Ark. Code. Ann. § 2-1-305.

The stated legislative purpose of the Act is to protect consumers from being misled or confused by false or misleading labeling of agricultural products that are edible by humans. *Id.* §

2-1-301.  To that end, Act 501 outlaws misbranding or misrepresenting an agricultural product edible by humans by, for example, representing the product as pork or a pork product when the product is not derived from a domesticated swine (Dkt. No. 17, at 3).  *See* Ark. Code Ann. § 2-1-305(9).  Act 501 includes similar prohibitions for products represented as beef (Dkt No. 17, at 3).  *See* Ark. Code Ann. § 2-1-305(8).  Act 501 also prohibits a person from representing a food product "as meat or a meat product" when the product is not derived from harvested livestock, poultry, or cervids (Dkt. No. 17, at 4).  *See* Ark. Code Ann. § 2-1-305(6).  Finally, Act 501 provides that the Director of the Bureau shall:  (1) administer and enforce the Act; (2) promulgate rules to implement the purposes and requirements of the Act; and (3) receive and investigate complaints regarding alleged violations of the Act and the rules promulgated by the Director (Dkt. No. 17-2, ¶ 4).  Ark. Code Ann. § 2-1-304.

As applied, Act 501 prohibits Tofurky from using words like "meat," "beef," "chorizo," "sausage," and "roast" to describe its plant-based meat products (Dkt. No. 14-1, ¶ 14).  Tofurky asserts that Act 501 might even prohibit Tofurky from accurately depicting its products in its marketing and on its packaging (*Id.*).  The statute provides no exception for plant-based meat producers that clearly identify their products as being vegetarian, vegan, or made from plants (*Id.*).

Each individual violation of Act 501 is punishable by a civil penalty of up to $1,000 (*Id.*, ¶ 15).  *See* Ark. Code Ann. § 2-1-306.  Given the volume of Tofurky's business in Arkansas, Tofurky fears that it is exposed to ruinous civil liability under Act 501 (Dkt. No. 14-1, ¶ 15).  Tofurky alleges that Act 501 leaves it with four choices:  (1) risk massive civil penalties, along with all of the harms that result from being penalized, by continuing its current marketing and packaging practices; (2) create specialized marketing and packaging practices just for the state of Arkansas, including attempting to police spillover from marketing in nearby states; (3) change its

marketing and packaging practices nationwide; or (4) refrain from marketing or selling its products in Arkansas at all (*Id.*, ¶ 16).

Tofurky estimates that the cost of changing its marketing and packaging practices nationwide would verge on $1,000,000, and even still it might be impossible to ensure that no nationwide marketing enters Arkansas (*Id.*, ¶ 17).  Further, Tofurky alleges that it is logistically and financially impractical to create separate products to be sold within Arkansas alone (*Id.*, ¶ 18).  Instead, Tofurky claims it would be forced to stop selling products in the entire region (*Id.*).  Due to the nature of distribution agreements, Tofurky states that it cannot ensure that Tofurky products would not cross state lines into Arkansas (*Id.*).  Tofurky represents that any of these options would be a significant burden, cost a considerable amount of money, and cause tangible market disadvantages (*Id.*, ¶ 19).  Additionally, Tofurky fears that it may be liable for media advertising in other states that spills over into Arkansas markets, including regional and national advertising that reaches Arkansas consumers through print, television, radio, and the internet (*Id.*, ¶ 21).

Finally, Tofurky believes that compliance with Act 501 may create bad will for Tofurky as customers may be confused by the language required to comply with the statute (*Id.*, ¶ 22).  If Tofurky is prohibited from using terms like "burger," "chick'n," and "sausage," customers may not understand what they are buying (*Id.*).  Tofurky believes this might lead customers to be frustrated with the unavailability of its plant-based meat products in Arkansas or puzzled about why its products are called different names and packaged differently in Arkansas (*Id.*, ¶ 23).  Tofurky alleges that the loss of goodwill from its customers would be a significant burden for Tofurky (*Id.*, ¶ 24).

Because Tofurky challenged the constitutionality of specific provisions of Act 501 before they became effective, the Bureau has not taken steps to enforce the provisions of Act 501

challenged by Tofurky at this time (Dkt. No. 17-2, ¶ 6). The Bureau has also not begun the process of promulgating rules related to implementing the purposes and requirements of the challenged portions of Act 501 (*Id.*). To avoid unnecessarily expending departmental resources and the efforts of the Bureau's staff, the Bureau does not intend to begin enforcement of the subsections of Act 501 challenged by Tofurky in this case until such time as Tofurky's constitutional challenge to those provisions is resolved (*Id.*, ¶ 7). To that end, Tofurky has not been assessed a civil penalty or fined under Act 501, and the Bureau has not taken steps to begin penalizing or fining Tofurky under Act 501 (*Id.*, ¶ 8). Additionally, it does not appear that Tofurky has removed any of its products from stores in Arkansas as a result of Act 501 or changed its labeling or marketing practices within the State (*Id.*, ¶ 9). However, the parties have not entered into a non-prosecution agreement, and the State has not represented that Tofurky will not face retroactive liability as a result of continued violations of Act 501 between its date of enactment and the ultimate resolution of Tofurky's constitutional challenge.

### III.      Article III Standing

The State contends that Tofurky lacks standing to assert its claims (Dkt. No. 17, at 6-9). For the foregoing reasons, the Court finds that Tofurky has proper standing to assert its claims.

### A.      Legal Standard

Under Article III of the Constitution of the United States, federal courts only have subject matter jurisdiction over "cases" and "controversies." U.S. Const., art. III, § 2; *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). If there is no case or controversy, then a court does not have subject matter jurisdiction and must dismiss the action. To be a case or controversy, the dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-241 (1937) (citations omitted).

Furthermore, the dispute must be "real and substantial" and request "specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id*. (citations omitted).

To establish Article III standing, a plaintiff must satisfy three requirements: "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotes and citations omitted).

The injury-in-fact requirement helps to ensure that a plaintiff has a "personal stake in the outcome of the controversy." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). For an injury to be "particularized," it must affect the plaintiff in a personal and individual way. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (citations omitted). A "concrete" injury must be "*de facto*," which means it cannot be abstract but must actually exist. *Spokeo, Inc.*, 136 S. Ct. at 1548 (citing Black's Law Dictionary 479 (9th ed. 2009)). The party invoking federal jurisdiction bears the burden of establishing standing. *Lujan*, 504 U.S. at 561.

As relevant here, "[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (citing *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)). In making the required showing, however, a plaintiff "need not expose itself to arrest

or prosecution in order to challenge" a statute. *St. Paul Area Chamber of Commerce v. Gaertner*, 439 F.3d 481, 485 (8th Cir. 2006). Nor must a plaintiff "await the consummation of threatened injury to obtain preventive relief." *Babbitt*, 442 U.S. at 298 (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923)). In particular, "[w]hen a statute is challenged by a party who is a target or object of the statute's prohibitions, 'there is ordinarily little question that the [statute] has caused him injury.'" *Gaertner*, 439 F.3d at 485 (quoting *Minn. Citizens Concerned for Life v. Fed. Election Comm'n*, 133 F.3d 129, 131 (8th Cir. 1997)). Moreover, a sufficient injury "is usually found if the regulation imposes costly, self-executing compliance burdens or if it chills protected First Amendment activity." *Minn. Citizens Concerned for Life*, 133 F.3d at 132 (citations omitted).

### B.      Analysis Of Standing

The State argues that Tofurky has not met its threshold burden of establishing that it has standing to challenge Act 501 (Dkt. No. 17, at 8). The State makes a multi-pronged argument, asserting that: Tofurky has not been assessed a civil penalty or fine under Act 501; the Bureau has not taken steps to begin penalizing or fining Tofurky under Act 501; Tofurky has not alleged that it has taken any steps to remove its products from stores in Arkansas; Tofurky has not alleged that it has taken any steps to change its marketing practice for fear of Act 501's mandates; and Tofurky does not appear to have removed any of its products or changed its labeling practices (*Id.*, at 8-9). In the State's estimation, these combined factors prove that Tofurky is not faced with "a credible threat of prosecution" that is sufficiently imminent under Act 501, robbing Tofurky of standing to challenge Act 501 (*Id.*, at 9). *See Driehaus*, 573 U.S. at 159. Tofurky challenges only six specific provisions of Act 501: Arkansas Code Annotated §§ 2-1-305(2), (5), (6), (8), (9), and (10) (Dkt. No. 14, at 1). The Court confines its analysis to those six provisions and determines whether

Tofurky has shown injury, causation, and redressability with respect to each provision it challenges. *See Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006) (citing *Lujan*, 504 U.S. at 560).

The State's arguments misunderstand what Tofurky must show to demonstrate appropriate standing. In a pre-enforcement suit, "a plaintiff satisfies the injury-in-fact requirement," and thus has standing, "where [it] alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Driehaus*, 573 U.S. at 159 (quoting *Babbitt*, 442 U.S. at 298). No party argues that Tofurky's advertisements and labels do not fall within the scope of Act 501; it is at least arguable that they will.

Mr. Soman has not yet promulgated regulations to implement Act 501,[2] and the parties have represented that the State does not intend to take any enforcement action against Tofurky during the pendency of this litigation (Dkt. No. 17-2, ¶ 7). The Court also notes that Tofurky has not been assessed a civil penalty or fine under Act 501 and that the Bureau has not taken steps to begin penalizing or fining Tofurky under Act 501 (Dkt. No. 17-2, ¶ 8).

The parties address these arguments with respect to injury-in-fact sufficient for standing, but these arguments also relate to ripeness. Courts assess ripeness through a two-fold test, "evaluat[ing] both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated by Califano v. Sanders*, 430 U.S. 99 (1977). Although no regulations have been promulgated, the inquiry raised by Tofurky's challenge to Act 501 is fundamentally a question of law. *See*

---

[2] The parties are directed to file a status report with the Court immediately if Mr. Soman, or anyone acting in concert with him, promulgates regulations pursuant to Act 501.

*Kimberly-Clark Corp. v. Dist. of Columbia*, 286 F. Supp. 3d 128, 137 (D.D.C. 2017) (examining similar facts and arguments in a First Amendment challenge to a municipal ordinance).

Moreover, upon conclusion of this litigation, the State could retroactively levy civil penalties of up to $1,000 against Tofurky for each statutory violation that occurs between the passage of Act 501 and this litigation's resolution (Dkt. No. 15, at 3). *See* Ark. Code Ann. § 2-1-306. Though the bill might not come due until the end, Tofurky faces the credible threat of running up its tab in the meantime. Given the possible $1,000 penalty per item and the vast number of Tofurky products in Arkansas currently out of compliance with Act 501, Tofurky convincingly asserts that such liability exposure would be "ruinous" (Dkt. No. 15, at 4). The State "has not argued to this Court that plaintiffs will not be prosecuted" if they continue to act in contravention of Act 501. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16 (2010) (citations omitted). Further, there is nothing stopping the State from simply changing its mind and deciding to prosecute Tofurky during the pendency of this litigation, despite its expressed intention thus far to postpone any enforcement until the resolution of Tofurky's constitutional challenge. Thus, the credible threat of incurring significant liability for continued actions in violation of Act 501 demonstrates sufficient injury and ripeness to grant Tofurky standing. *See Kimberly-Clark*, 286 F. Supp. 3d at 137-38 (examining similar issues and citing *Abbott Labs.*, 387 U.S. 138-39).

The State's arguments regarding Tofurky's failure to remove its products from Arkansas stores, change its marketing practices, or change its labeling practices fall flat, as well (Dkt. No. 17-2, ¶ 9). In essence, in order to show standing, the State would have Tofurky "design, produce, and distribute different, specialized marketing and packaging for its products when they will be sold in the state of Arkansas, creating a logistical nightmare in distribution channels that service neighboring states," "change the entirety of its marketing and packaging nationwide to comply

with the Act, at considerable expense," or "refrain from marketing or selling its products in Arkansas at all" (Dkt. No. 1, ¶ 54).  Such drastic measures from Tofurky would certainly represent adhering to a "regulation [that] imposes costly, self-executing compliance burdens."  *Minn. Citizens Concerned for Life*, 133 F.3d at 132 (citations omitted).  As in *Minnesota Citizens Concerned for Life*, the costly burden required for Tofurky to comply with Act 501 also demonstrates sufficient injury and ripeness to confer Tofurky standing.

## IV.    Abstention

The State also contends that the Court should abstain from addressing the constitutionality of Act 501 and defer to the authority of Arkansas' state courts to interpret the law (Dkt. No. 17, at 9-10).  For the following reasons, the Court finds that abstention would be improper in this case.

### A.    Legal Standard

"[F]ederal courts have a virtually unflagging obligation . . . to exercise the jurisdiction given to them."  *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817-18 (1976) (citations omitted).  However, this obligation is not "absolute."  *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (citing *Canada Malting Co. v. Paterson S.S., Ltd.,* 285 U.S. 413, 422 (1932)).  Abstention doctrine provides that "federal courts may decline to exercise their jurisdiction, in otherwise 'exceptional circumstances,' where denying a federal forum would clearly serve an important countervailing interest."  *Id.* (quoting *Colorado River*, 424 U.S. at 813).  Notably, the Supreme Court has stated that abstention is "the exception and not the rule," and the Court "[has] been particularly reluctant to abstain in cases involving facial challenges based on the First Amendment."  *City of Houston, Tex. v. Hill*, 482 U.S. 451, 467 (1987) (footnote and internal citations omitted).

Rather than invoking any of the traditional abstention doctrines, the State summarily argues that the Court should allow the Arkansas Supreme Court to have the first opportunity to consider the constitutionality of Act 501 (Dkt. No. 17, at 10).  This generalized argument seems to be an unspecified request for *Pullman* abstention.  Though there are several abstention doctrines, the *Pullman* abstention doctrine covers actions to enjoin state or local officers from enforcing an allegedly unconstitutional state law.  *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941).  "[T]he purpose of *Pullman* abstention in such cases is to avoid resolving the federal question by encouraging a state-law determination that may moot the federal controversy." *San Remo Hotel, L.P. v. City and County of San Francisco, Cal.*, 545 U.S. 323, 349 (2005) (citing *England v. La. State Bd. of Med. Examiners*, 375 U.S. 411, 416-17 (1964)).  Thus, in situations "[w]here resolution of the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law, abstention may be proper in order to avoid unnecessary friction in federal[-]state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication." *Harman v. Forssenius*, 380 U.S. 528, 534 (1965).  However, "[t]he mere possibility that a state's interpretation of its law may avoid the necessity for an injunction does not preclude federal review." *Middle S. Energy, Inc. v. Ark. Pub. Serv. Comm'n*, 772 F.2d 404, 413 (8th Cir. 1985). "The [*Pullman*] abstention doctrine is not an automatic rule applied whenever a federal court is faced with a doubtful issue of state law; it rather involves a discretionary exercise of a court's equity powers." *Baggett v. Bullitt*, 377 U.S. 360, 375 (1964).  Importantly, this "abstention rule only applies where 'the issue of state law is uncertain.'" *Wisconsin v. Constantineau*, 400 U.S. 433, 439 (1971) (quoting *Harman*, 380 U.S. at 534).  "Where there is no ambiguity in the state

statute, the federal court should not abstain but should proceed to decide the federal constitutional claim." *Id.* (citing *Zwickler v. Koota*, 389 U.S. 241, 250-51 (1967)).

## B.   Analysis Of Abstention

In support of its abstention argument that the Court should allow the Arkansas Supreme Court to have the first opportunity to consider the constitutionality of Act 501, the State cites three cases: *Virginia v. American Booksellers Association, Inc.*, 484 U.S. 383 (1988), *Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975), and *United Food and Commercial Workers International Union, AFL-CIO, CLC v. IBP, Inc.*, 857 F.2d 422 (8th Cir. 1988) (Dkt. No. 17, at 9-10). The State cites these three cases for the proposition that, if a facially-challenged statute is "'readily susceptible' to a narrowing construction that would make it constitutional, it will be upheld." *Am. Booksellers Ass'n*, 484 U.S. at 397 (citing *Erznoznik*, 422 U.S. at 216; *Broadrick v. Oklahoma*, 413 U.S. 601 (1973)); *see also Erznoznik*, 422 U.S. at 216 ("[T]he Court has held that a state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts." (citing *Dombrowski v. Pfister*, 380 U.S. 479, 497 (1965))); *IBP*, 857 F.2d at 431 (same). These cases also posit that state courts are more appropriately situated than federal courts to fashion these narrowing constructions. *Am. Booksellers Ass'n*, 484 U.S. at 397 (certifying construction of contested state statutes to the Virginia Supreme Court); *Erznoznik*, 422 U.S. at 216 (stating that a narrowing construction by the state courts can rescue a state statute from facial invalidation); *IBP*, 857 F.2d at 431 (stating that federal courts "may not impose [their] own narrowing construction . . . if the state courts have not already done so" (internal quotations and citation omitted)).

However, the State proffers no narrowed construction of Act 501 that would avoid the constitutional questions plaguing the law. The Court does not see how Act 501, straightforward

as it is, could be "readily susceptible" to a narrowed construction that skirts the constitutional questions in this case. *See Erznoznik*, 422 U.S. at 216-17 ("In the present case the possibility of a limiting construction appears remote . . . . Moreover, the [law] by its plain terms is not easily susceptible of a narrowing construction . . . . In these circumstances, . . . there is no reason to assume that the [law] can or will be decisively narrowed."). Here, "the naked question, uncomplicated by an unresolved state law, is whether the Act on its face is unconstitutional." *Constantineau*, 400 U.S. at 439. Given the lack of ambiguity in Act 501, the Court declines to apply abstention and proceeds to examine the constitutional claims.

## V.    Facial Versus As Applied Challenge

In its complaint, Tofurky alleges that Act 501 is unconstitutional on its face and as applied (Dkt. No. 1, ¶ 3). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). In the First Amendment context, the Supreme Court "recognizes a second type of facial challenge, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 449 n.6 (2008) (internal quotation marks omitted)). "The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Stevens*, 559 U.S. at 474 (quoting *United States v. Williams,* 553 U.S. 285, 293 (2008)). If the regulation reaches a substantial amount of constitutionally protected conduct, then a party may bring an overbreadth challenge. *See Village*

*of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982).[3]  However, whether Act 501 has an overbroad scope encompassing protected commercial speech of other persons is irrelevant because the overbreadth doctrine does not apply to commercial speech. *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 565 n.8 (1980).

It remains that a facial challenge is "strong medicine" and "disfavored," as it risks "premature interpretations of statutes" and "run[s] contrary to the fundamental principle of judicial restraint." *Wash. State Grange*, 552 U.S. at 449 n.6, 450.  At this stage of the proceeding, and on the record before it, the Court confines its analysis to an as applied challenge brought by Tofurky. In other words, the Court examines only whether Act 501 is constitutional as applied to Tofurky's advertisements.

## VI.     Preliminary Injunction Discussion

For the following reasons, the Court determines that Tofurky meets its burden for the issuance of a preliminary injunction enjoining enforcement of the six provisions of Act 501 challenged by Tofurky and as applied to Tofurky:  Arkansas Code Annotated §§ 2-1-305(2), (5), (6), (8), (9), and (10).

### A.     Legal Standard

When determining whether to grant a motion for preliminary injunction, this Court considers:  "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (quoting *Dataphase Sys. Inc. v. CL Sys.,* 640 F.2d 109, 113 (8th

---

[3]  Even if a law does not reach constitutionally protected conduct, thereby satisfying overbreadth requirements, the law still may be challenged on its face as unduly vague in violation of the Fourteenth Amendment. *Village of Hoffman Estates*, 455 U.S. at 497-98.

Cir. 1981)).  "While no single factor is determinative, the probability of success factor is the most significant."  *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citing *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013)) (internal quotations and citation omitted); *see also Phelps-Roper v. Nixon*, 509 F.3d 480, 485 (8th Cir. 2007), *modified on reh'g*, 545 F.3d 685 (8th Cir. 2008) ("In a First Amendment case . . . the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue.").  However, likelihood of success "is insufficient on its own."  *Roudachevski v. All-American Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (citing *Watkins, Inc. v. Lewis*, 846 F.3d 841, 844 (8th Cir. 2003)).  "Even when a plaintiff has a strong claim on the merits, preliminary injunctive relief is improper absent a showing of a threat of irreparable harm."  *Id.*

Preliminary injunctive relief is an extraordinary remedy, and the party seeking such relief bears the burden of establishing the four *Dataphase* factors.  *Watkins,* 346 F.3d at 844 (citing *Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 418 (8th Cir. 1987)).  The Court examines the *Dataphase* factors as applied to plaintiff's request for a preliminary injunction.  *See Dataphase*, 640 F.2d at 109.  The focus is on "whether the balance of the equities so favors the movant that justice requires the court to intervene to preserve the *status quo* until the merits are determined."  *Watkins*, 346 F.3d at 844.

The Eighth Circuit revised the *Dataphase* test when applied to challenges to laws passed through the democratic process.  Those laws are entitled to a "higher degree of deference."  *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 725, 732 (8th Cir. 2008).  In such cases, it is never sufficient for the moving party to establish that there is a "fair chance" of success. Instead, the appropriate standard, and threshold showing that must be made by the movant, is "likely to prevail on the merits."  *Id.*  Only if the movant has demonstrated that it is likely to prevail

on the merits should the Court consider the remaining factors.  *Id.*  This "elevated standard for enjoining enforcement of validly enacted statutes is designed 'to ensure that preliminary injunctions that thwart a state's presumptively reasonable democratic processes are pronounced only after an *appropriately deferential analysis*.'"  *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1054 (8th Cir. 2014) (quoting *Rounds*, 530 F.3d at 733) (emphasis in original).

### B.    Analysis

The State asserts that Tofurky fails to meet its burden to warrant granting a preliminary injunction (Dkt. No. 17, at 11-29).  Specifically, the State challenges Tofurky's claims on all four *Dataphase* factors necessary to grant a preliminary injunction (Dkt. No. 17, at 11).

### 1.    Likelihood Of Success On The Merits:
### The First Amendment Claim

In its motion for preliminary injunction, Tofurky challenges six provisions from Act 501, Arkansas Code Annotated §§ 2-1-305(2), (5), (6), (8), (9), and (10), as violating the Free Speech Clause of the First Amendment and the Due Process Clause of the Fourteenth Amendment (Dkt. No. 1, ¶ 2).  The Court considers Tofurky's likelihood of success on the merits of its First Amendment claim, determines that Tofurky has demonstrated it is likely to prevail on the merits of its First Amendment claim as applied, and therefore declines to reach the merits of Tofurky's Fourteenth Amendment claim.

### a.    Legal Standard

Commercial speech is generally defined in one of two ways:  "expression related solely to the economic interests of the speaker and its audience," or "speech proposing a commercial transaction."  *Cent. Hudson*, 447 U.S. at 561-62.  "The First Amendment, as applied to the States through the Fourteenth Amendment, protects commercial speech from unwanted governmental regulation."  *Id.* at 561 (citing *Va. Pharmacy Bd. v. Va. Citizens Consumer Council*, 425 U.S. 748,

761-62 (1976)).  In analyzing restrictions on commercial speech, the Supreme Court articulated an intermediate scrutiny framework for commercial speech in *Central Hudson* resulting in a four-part test.[4]  447 U.S. at 765.  Under the *Central Hudson* test, courts "test the constitutionality of laws burdening commercial speech" by considering:  "(1) whether the commercial speech at issue concerns unlawful activity or is misleading; (2) whether the governmental interest is substantial; (3) whether the challenged regulation directly advances the government's asserted interest; and (4) whether the regulation is no more extensive than necessary to further the government's interest." *Otto*, 744 F.3d at 1055 (citing *Cent. Hudson*, 447 U.S. at 566).  Provided that the speech is not false or inherently misleading, "[e]ach of these latter three inquiries must be answered in the affirmative for the regulation to be found constitutional." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367 (2002); *see also Mo. ex rel. Nixon v. Am. Blast Fax, Inc.*, 323 F.3d 649, 653 (8th Cir. 2003) (same).

The first prong of the *Central Hudson* test "ask[s] as a threshold matter whether the commercial speech concerns unlawful activity or is misleading." *Thompson*, 535 U.S. at 367.  If the speech concerns unlawful activity or is misleading, "then the speech is not protected by the

---

[4]  The Court notes that the *Central Hudson* test is sometimes referred to as a four-part test and sometimes referred to as a three-part test with a threshold question. *Compare City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 435 (1993) (Blackmun, J., concurring) ("Under the analysis adopted by the *Central Hudson* majority, misleading and coercive commercial speech and commercial speech proposing illegal activities are addressed in the first prong of the four-part test.") *with Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 624 (1995) ("Commercial speech that falls into neither of those categories, like the advertising at issue here, may be regulated if the government satisfies a test consisting of three related prongs . . . ."). Since the Eighth Circuit appears to consider *Central Hudson* a four-part test, this Court follows the Eighth Circuit's lead in that respect. *See, e.g.*, *Mo. Broadcasters Ass'n v. Lacy*, 846 F.3d 295, 300 (8th Cir. 2017) ("In *Central Hudson*, the Supreme Court identified four considerations to determine the constitutionality of laws burdening commercial speech . . . ."); *Otto*, 744 F.3d at 1055 ("The well-known *Central Hudson* inquiry, in turn, employs a four-part standard to test the constitutionality of laws burdening commercial speech . . . .").

First Amendment." *Id.*  "[W]hen the particular content or method of the advertising suggests that it is inherently misleading . . . the States may impose appropriate restrictions," without violating the First Amendment.  *In re. R. M. J.*, 455 U.S. 191, 203 (1982).  "'Inherently misleading' speech is speech that 'inevitably will be misleading' to consumers." *Otto*, 744 F.3d at 1056 (quoting *Bates v. State Bar of Ariz.*, 433 U.S. 350, 372 (1977)).  "The 'inherently misleading' character of speech may be inferred from 'the particular content or method of the advertising' as well as from 'experience [that] has proved that in fact such advertising is subject to abuse.'" *Id.* (quoting *R. M. J.*, 455 U.S. at 203).  "Misleading advertising may be prohibited entirely."  *R. M. J.*, 455 U.S. at 203; *see also Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 638 (1985) ("The States and the Federal Government are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading . . . ." (citations omitted)).  However, "[i]f the communication is neither misleading nor related to unlawful activity, the government's power is more circumscribed," and courts proceed with the remainder of the *Central Hudson* analysis.  *Cent. Hudson*, 447 U.S. at 564.

The second prong of the *Central Hudson* test requires the State to "assert a substantial interest to be achieved by restrictions on commercial speech."  *Cent. Hudson*, 447 U.S. at 564. The State may "show the significance of the harm it seeks to remedy" and "demonstrate the substantiality of the interests with anecdotes, history, consensus, and simple common sense." *Am. Blast Fax*, 323 F.3d at 654 (internal quotations and citations omitted).  "[E]mpirical studies" are permitted but not required.  *Id.*  In considering the State's interest, the Court "must identify with care the interests the State itself asserts." *Edenfield v. Fane*, 507 U.S. 761, 768 (1993).  "Unlike rational-basis review, the *Central Hudson* standard does not permit [the Court] to supplant the precise interests put forward by the State with other suppositions." *Id.* (citing *Bd. of Trs. of State*

*Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)).  Crucially, the Court will also consider whether

"it appears that the stated interests are not the actual interests served by the restriction."  *Id.* (citing

*Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 730 (1982)).

> The third prong of the *Central Hudson* test requires that:
>
> [T]he speech restriction directly and materially advanc[e] the asserted governmental interest. "This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree."

*Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 188 (1999) (quoting *Edenfield*,

507 U.S. at 770-71); *see also Went For It*, 515 U.S. at 625 ("Under *Central Hudson*'s [third] prong,

the State must demonstrate that the challenged regulation advances the Government's interest in a

direct and material way." (internal quotations and citations omitted)).  "[T]he regulation may not

be sustained if it provides only ineffective or remote support for the government's purpose."  *Cent.*

*Hudson*, 447 U.S. at 564.

The fourth prong of the *Central Hudson* test "complements the direct-advancement inquiry

of the third, asking whether the speech restriction is not more extensive than necessary to serve

the interests that support it."  *Greater New Orleans*, 527 U.S. at 188.  The Supreme Court has

"made clear that 'the least restrictive means' is not the standard; instead, the case law requires a

reasonable 'fit between the legislature's ends and the means chosen to accomplish those ends, . . .

a means narrowly tailored to achieve the desired objective.'"  *Lorillard Tobacco Co. v. Reilly*, 533

U.S. 525, 556 (2001) (quoting *Went For It, Inc.*, 515 U.S. at 632).  This prong "is not satisfied if

there are alternatives to the regulation[] that directly advance[] the asserted interest in a manner

less intrusive to plaintiffs' First Amendment rights."  *Mo. Broadcasters*, 846 F.3d at 302-03 (citing

*Rubin v. Coors Brewing Co.*, 514 U.S. 476, 490-91 (1995)).  However, the State is "not required

21

to show 'the manner of restriction is absolutely the least severe that will achieve the desired end.'"

*Id.* at 303 (quoting *Fox*, 492 U.S. at 480).

### b.     Analysis

Both parties agree that the information on Tofurky's packaging, labeling, and marketing materials represents commercial speech.  The parties disagree as to whether that commercial speech merits First Amendment protection.  Tofurky asserts that Act 501 unconstitutionally restricts protected commercial speech (Dkt. No. 15, at 6-7).  Tofurky further argues that Act 501 does not advance a substantial government interest and is not appropriately tailored to any government interest (*Id.*, at 7-13).  The State argues that Tofurky's commercial speech is "inherently misleading" and thus outside the First Amendment's protections (Dkt. No. 17, at 13-17).  Additionally, the State argues that, even if Tofurky's commercial speech warrants First Amendment protection, Act 501 should stand because the State has a substantial interest in regulating the speech, Act 501 directly and materially advances the State's interest, and Act 501's restriction is no more extensive than necessary to advance the State's interest (*Id.*, at 18-23).

The State argues that Tofurky's labels for its plant-based products are inherently misleading because they use the names and descriptors of traditional meat items but do not actually include the product they invoke, including terms like "chorizo," "hot dogs," "sausage," and "ham roast" (Dkt. No. 17, at 15).  Additionally, the State points out that Tofurky designs its food products to approximate the texture, flavor, and appearance of meat derived from slaughtered animals (*Id.*).  The State believes these factors make Tofurky's speech inherently misleading (*Id.*).  Tofurky counters that the State's argument is not plausible as words such as "meat," "burger," and "steak" have been used for decades—and in some cases centuries—to describe foods that are not made from slaughtered animals (Dkt. No. 15, at 7).  Further, Tofurky contends that its labels and

marketing materials prominently identify its products variously as "all vegan," "plant based," "vegetarian," "veggie," and "made with pasture raised plants" on the front of the packages of it products (*Id.*).

The Court has seven labels before it in the record (Dkt. No. 14-1, at 6-7).  These labels are for products the Court will refer to as "Veggie Burger," "Deli Slices," "Chorizo Style Sausage," "Slow Roasted Chick'n," "Original Sausage Kielbasa," "Hot Dogs," and "Vegetarian Ham Roast" (*Id.*).  The Court has considered the labels before it in the record and finds the speech at issue not inherently misleading.  It is true, as the State contends, that these labels use some words traditionally associated with animal-based meat.  However, the simple use of a word frequently used in relation to animal-based meats does not make use of that word in a different context inherently misleading.  This understanding rings particularly true since the labels also make disclosures to inform consumers as to the plant-based nature of the products contained therein.

The "Veggie Burger" label has the word "veggie" modifying the word "burger" and includes the words "all vegan" in the middle of the package (*Id.*, at 6).  Further, the "Veggie Burger" label features the words "white quinoa" next to a picture of the burger (*Id.*).  The "Deli Slices" label also includes the words "all vegan" in the middle of the label, features the words "plant-based" next to a picture of the product, and describes the product as "smoked ham *style*" (*Id.*) (emphasis added).  The "Chorizo Style Sausage" label includes the words "all vegan" and states that the product was "made with pasture raised plants" (*Id.*).  The "Slow Roasted Chick'n" label has the words "all vegan" right next to the product's name and describes the product as "plant-based" in the bottom left corner (*Id.*).  The "Original Sausage Kielbasa" label includes the words "all vegan" next to the word "sausage" and identifies the product as "Polish-style wheat gluten and tofu sausages" (*Id.*, at 7).  The "Hot Dogs" label has the words "all vegan" next to the

word "dogs" and "plant-based" under the word "dogs" (*Id.*).  The "Vegetarian Ham Roast" has the word "vegetarian" modifying the words "ham roast (*Id.*).  Each of these labels also feature the letter "V" in a circle on the front of the packaging, a common indicator that a food product is vegan or vegetarian (*Id.*, at 6-7).  Finally, each of these labels feature the company name "Tofurky," which clearly contains the word "tofu" in a play on the word "turkey" (*Id.*).

In "considering the label as a whole," the Court contemplates whether "an ordinary consumer would [ ] be deceived" as to the nature of the product.  *Howard v. Bayer Corp.*, No. 4:10-cv-1662-DPM, 2011 WL 13224118, at *2 (E.D. Ark. July 22, 2011).  Here, the Court concludes that Tofurky is likely to prevail on the merits of its argument that the labels' repeated indications that the food products contained in these packages contain no animal-based meat dispel consumer confusion and render the speech not inherently misleading.  "[T]his is not a case of key information in minuscule type buried deep among many ingredients."  *Howard*, 2011 WL 13224118, at *1 (citation omitted).

The State appears to believe that the simple use of the word "burger," "ham," or "sausage" leaves the typical consumer confused, but such a position requires the assumption that a reasonable consumer will disregard all other words found on the label.  *See, e.g.*, *Ang v. Whitewave Foods Co.*, No. 13-cv-1953, 2013 WL 6492353, at *4 (N.D. Cal. Dec. 10, 2013) ("Under Plaintiffs' logic, a reasonable consumer might also believe that veggie bacon contains pork, that flourless chocolate cake contains flour, or that e-books are made out of paper.").  That assumption is unwarranted.  The labels in the record evidence include ample terminology to indicate the vegan or vegetarian nature of the products.  Additionally, "[t]here is no contention that any [consumer or potential consumer] was actually misled or deceived by" Tofurky's packaging, labeling, or marketing.  *Peel v. Attorney Registration & Disciplinary Comm'n of Ill.*, 496 U.S. 91, 100-01 (1990).  Thus, the

Court concludes that Tofurky is likely to prevail on its argument that, "considering the label as a whole, an ordinary consumer would not be deceived about" whether Tofurky's products contain animal-based meat. *Howard*, 2011 WL 13224118, at *2.

Act 501 also includes a detailed "Definitions" section that helps to define Act 501's prohibitions. *See* Ark. Code Ann. §§ 2-1-302; 305. Tofurky's plant-based products are not beef, beef product, livestock, meat, meat product, pork, pork product, or poultry within Act 501's definition of those terms. *See* Ark. Code Ann. § 2-1-302. Though the State has defined these terms in Act 501, those definitions do not serve as trademarks on these terms. In this regard, the facts of this case seem analogous to those of *Ocheesee Creamery LLC v. Putnam*, 851 F.3d 1228 (11th Cir. 2017). In *Ocheesee*, the Eleventh Circuit considered whether the plaintiffs' use of the term skim milk "was inherently misleading because it conflicted with the State's definition of 'skim milk,' according to which the product would include replenished vitamin A." *Id.* at 1238. The Eleventh Circuit noted that "[i]t is undoubtedly true that a state can propose a definition for a given term. However, it does not follow that once a state has done so, any use of the term inconsistent with the state's preferred definition is inherently misleading." *Id.* As in *Ocheesee*, Tofurky's use of the contested terms deviates from the State's definitions of those terms in Act 501. Those deviations, though, do not render Tofurky's speech inherently misleading.

As a result, Tofurky is likely to prevail on its arguments that its labeling is neither unlawful nor inherently misleading and that Tofurky's commercial speech warrants First Amendment protection. Accordingly, given Tofurky's likelihood of success on the merits on this point, "the State's speech restriction is subject to intermediate scrutiny under the remainder of the *Central Hudson* test." *Ocheesee Creamery*, 851 F.3d at 1240.

As to *Central Hudson*'s second prong, the Court notes that combatting deceptive, misleading, or false advertising is a legitimate and substantial interest recognized by both the Supreme Court and the Eighth Circuit.  *See Zauderer*, 471 U.S. at 651 (holding that "preventing deception of customers" is a substantial interest); *Otto*, 744 F.3d at 1061 (noting the State of Minnesota's "substantial interest in protecting the public from misleading and false advertising"). Given this precedent, the Court assumes, without deciding, that the State has a substantial interest in "protect[ing] consumers from being misled or confused by false or misleading labeling of agricultural products that are edible by humans."  Ark. Code Ann. § 2-1-301.

However, as to *Central Hudson*'s third prong, the Court determines that Tofurky is likely to prevail on its argument that Act 501 does not "directly and materially" advance the State's asserted interest in "protect[ing] consumers from being misled or confused by false or misleading labeling of agricultural products that are edible by humans," given that the Court concludes Tofurky is likely to prevail on its argument that its speech is neither false nor misleading.  *See Greater New Orleans*, 527 U.S. at 188; Ark. Code Ann. § 2-1-301.

Similarly, as to *Central Hudson*'s fourth prong, the Court finds that Tofurky is likely to prevail on its argument that Act 501 is likely "more extensive than necessary to serve the State's interest."  *Cent. Hudson*, 447 U.S. at 566.  Act 501 seems unlikely to be a "reasonable fit" if the law, predicated upon preventing misleading commercial speech, outright bans what Tofurky is likely to prevail in proving is non-misleading commercial speech.  It remains true that the State is "not required to show 'the manner of restriction is absolutely the least severe that will achieve the desired end.'"  *Mo. Broadcasters*, 846 F.3d at 303 (quoting *Fox*, 492 U.S. at 480).  However, Tofurky is likely to succeed in demonstrating that Act 501's blanket restriction is far more extensive than necessary, and the State "disregard[s] far less restrictive and precise means" for

achieving its stated purpose. *Fox*, 492 U.S. at 479 (quoting *Shapero v. Ky. Bar Ass'n*, 486 U.S. 466, 476 (1988)). Tofurky identifies several in-effect federal and state laws directed at prohibiting deceptive labeling and marketing of food products, and consumer products more generally, with which Tofurky contends its food labeling complies; these laws have not been enforced against Tofurky's labels based on the record evidence before the Court (Dkt. Nos. 1, ¶¶ 21-33; 15, at 11-12). There also is no convincing argument as to why each of these laws is ineffective at policing the alleged deceptive or confusing practices the State purports to target. Further, as opposed to the prohibition in Act 501, the State could require more prominent disclosures of the vegan nature of plant-based products, create a symbol to go on the labeling and packaging of plant-based products indicating their vegan composition, or require a disclaimer that the products do not contain meat if further laws are deemed necessary to advance its stated purpose. *See Pearson v. Shalala*, 164 F.3d 650, 657 (D.C. Cir. 1999) ("[T]he Court has . . . repeatedly point[ed] to disclaimers as constitutionally preferable to outright suppression." (citing *Peel*, 496 U.S. at 110; *R. M. J.*, 455 U.S. at 206 n.20; *Shapero*, 486 U.S. at 478)). As in *Ocheesee Creamery*, the Court determines that Tofurky is likely to prevail on its argument that "the measure is clearly more extensive than necessary to achieve its goals." 851 F.3d at 1240.

As a final matter regarding the *Central Hudson* test, the Court restates that it typically will consider whether "it appears that the stated interests are not the actual interests served by the restriction." *Edenfield*, 507 U.S. at 768 (citing *Hogan*, 458 U.S. at 730). Here, Tofurky alleges that Act 501's "true purpose is not to protect consumers, but to stoke confusion in order to benefit the economic interests of the meat industry," while the State argues to the contrary (Dkt Nos. 15, at 9-10; 17, at 18-19). Because the Court finds that Tofurky is likely to prevail in demonstrating that Act 501 does not advance the stated governmental interest of protecting consumers from being

misled or confused, the Court deems it unnecessary at this time and on the limited record before it to assess whether the stated interests the Court identifies are not the actual interests served by Act 501.

Therefore, for the foregoing reasons, the Court finds that Tofurky is likely to prevail on the merits of its First Amendment claim.  Because the Court concludes that Tofurky is likely to prevail on the merits of its First Amendment claim, the Court declines to examine further the Fourteenth Amendment claim at this time.

### 2.      Threat Of Irreparable Harm

"To succeed in demonstrating a threat of irreparable harm, 'a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'" *Roudachevski*, 648 F.3d at 706 (quoting *Ia. Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996)).  A plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original) (citations omitted).

The State asserts that there can be no real dispute that Tofurky is not facing any irreparable harm in the absence of a preliminary injunction (Dkt. No. 17, at 25).  The Court disagrees for two reasons.  First, the Supreme Court has stated that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971)); *see also Phelps-Roper*, 509 F.3d at 485 ("If [plaintiff] can establish a substantial likelihood of success on the merits of her First Amendment claim, she will also have established irreparable harm as the result of the deprivation.").  As discussed, the Court concludes on the record before it that Tofurky

is likely to prevail on its claim that Act 501 violates Tofurky's First Amendment rights, and that violation constitutes irreparable injury.[5]

Second, and related, is the fact that Tofurky currently appears to stand out of compliance with Act 501 and could be subject to Act 501's penalties at any time.  Given the number of Tofurky products throughout Arkansas and the fact that each violation of Act 501 could result in a fine up to $1,000, Tofurky likely faces ruinous civil liability, enormous operational costs, or a cessation of in-state operations were Act 501 enforced against it (Dkt. No. 14-1, ¶¶ 15-16).  Though the State has represented that it "does not intend to begin enforcement of the subsections of Act 501 challenged by Tofurky in this case until such time as [Tofurky's] constitutional challenge to those provisions are [sic] resolved," there is nothing in the record binding the State to that position (Dkt. No. 17-2, ¶ 8).  Further, regardless of whether it takes action to enforce Act 501 during the pendency of this litigation, the State has made no assurances that it will not levy retroactive penalties for Tofurky's alleged violations of Act 501 between the law's passage and this litigation's conclusion.  As a result, if Act 501 proves constitutional, Tofurky could be liable for violations that occur every day this law's enforcement by the State is not enjoined.

Tofurky also asserts that the State's sovereign immunity under the Eleventh Amendment prevents Tofurky from recovering damages suffered as a result of the State's enforcement of, or

---

[5] Though this Court has previously identified select instances in which First Amendment violations did not constitute irreparable injury, none of those limited circumstances apply here. *See American Atheists, Inc., et al. v. Rapert*, No. 4:19-cv-00017, Dkt. No. 27, at 63-68 (E.D. Ark. Sept. 30, 2019).  In *American Atheists*, this Court confronted a novel First Amendment issue in the form of a state legislator blocking constituents and Arkansas citizens on various social media platforms.  After a thorough analysis, this Court denied plaintiffs' request for a preliminary injunction.  The factors that weighed in defendants' favor—including, but not limited to, plaintiffs' great delay in seeking injunctive relief, the possibility of plaintiffs creating alternate social media accounts, and the difficulty in assessing the scope and magnitude of the harm endured—are all absent here.

Tofurky's compliance with, Act 501 (Dkt. No. 15, at 15).  Tofurky claims that this sovereign immunity bar to Tofurky's damages claim also constitutes irreparable harm as a matter of law (*Id.*).  The Court notes that "[t]he importance of preliminary injunctive relief is heightened in this case by the likely unavailability of money damages should [Tofurky] prevail on the merits of its claims," since "[r]elief in the form of money damages could well be barred by [Arkansas'] sovereign immunity." *Entergy, Ark., Inc. v. Nebraska*, 210 F.3d 887, 899 (8th Cir. 2000) (citing *Idaho v. Couer d'lene Tribe of Idaho*, 521 U.S. 261, 269 (1997)).  The likely absence of money damages available to Tofurky given that the State is subject to the Eleventh Amendment's sovereign immunity bar also weighs in favor of irreparable harm to Tofurky.

Thus, Tofurky has satisfied the Court that it will likely suffer irreparable harm in the absence of an injunction.

### 3.       Balance Of The Equities

"The third *Dataphase* factor requires a district court to consider the balance between the harm to the movant and the injury that granting the injunction will inflict on other interested parties." *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 489 (8th Cir. 1993) (citing *Dataphase*, 640 F.2d at 114).  "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113 (footnote omitted).  "No single [*Dataphase*] factor in itself is dispositive; rather, each factor must be considered to determine whether the balance of equities weighs toward granting the injunction." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998) (citations omitted).

As stated above, Tofurky faces substantial detrimental impact in complying with Act 501.  Tofurky has invested significant resources in marketing and packaging its products (Dkt. No. 14-

1, ¶ 11).  Should Act 501 stand, the law likely requires Tofurky to:  (1) risk civil penalties by continuing its current marketing and packaging practices; (2) create specialized marketing and packaging practices for Arkansas, including attempting to police spillover from marketing in nearby states; (3) change its marketing and packaging practices nationwide; or (4) refrain from marketing or selling its products in Arkansas at all (*Id.*, ¶ 16).  Each of these options represent a potential burden, and corresponding chilling effect, on Tofurky's commercial speech rights (Dkt. No. 15, at 16).

In rebuttal, the State insists that Tofurky focuses on the potential harm it will allegedly suffer if Act 501 is enforced but that there is no risk of such enforcement here until Tofurky's constitutional challenge is resolved (Dkt. No. 17, at 27).  The State's position, therefore, is that the balance of equities favors the State since Tofurky is currently suffering no harm (*Id.*).  This argument proves unpersuasive.  It overlooks that Tofurky is likely to prevail on its First Amendment claim challenging Act 501 as a burden on its First Amendment rights and that the State, by making a representation with no corresponding binding agreement, has not sufficiently guaranteed non-enforcement of Act 501 against Tofurky now or retroactively.  Further, the State offers no compelling equities of its own served by the denial of a preliminary injunction, especially if the Court is to accept the State's representation that it has no interest in enforcing Act 501 until this litigation is resolved.  As a result, the Court determines that the balance of the equities tilts toward Tofurky, not the State.

Thus, the Court finds that Tofurky has established that the balance of equities is in its favor.

### 4.      Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at

31

24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).  As relevant here, "[t]he public is served by the preservation of constitutional rights."  *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019) (quotation and citation omitted).  "Whether the grant of a preliminary injunction furthers the public interest in [cases involving constitutional rights] is largely dependent on the likelihood of success on the merits because the protection of constitutional rights is always in the public interest."  *Rounds*, 530 F.3d at 752 (Murphy, J., dissenting) (citing *Phelps-Roper*, 509 F.3d at 485).

Tofurky alleges that the public interest favors an injunction for two reasons.  First, citing *Phelps-Roper*, is the contention that it is always in the public interest to protect against the violation of constitutional rights (Dkt. No. 15, at 17).  *See* 509 F.3d at 485.  Second is the assertion that Arkansas consumers will benefit from the free flow of truthful and non-misleading commercial information allowing them to identify plant-based options for their favorite meals (Dkt. No. 15, at 17).  In response, the State argues that an injunction will have no effect on Tofurky's speech or the public's access to the free flow of commercial information (Dkt. No. 17, at 28).

Given that the case at issue fundamentally revolves around constitutional rights and that Tofurky has demonstrated its likelihood of prevailing on the merits, the Court finds that the grant of an injunction is in the public interest.  *See Rounds*, 530 F.3d at 752 (Murphy, J., dissenting) (citing *Phelps-Roper*, 509 F.3d at 485).  Again, as discussed above, the risk of current litigation or future litigation initiated by the State over alleged ongoing violations remains, absent the entry of a preliminary injunction.  That persistent risk chills Tofurky's commercial speech, which in turn might inhibit such speech from reaching Arkansas consumers.  The status quo is represented by that speech being available to consumers in the marketplace.  At this point, on the record before

it, the Court determines that the public interest weighs in favor of a preliminary injunction while Act 501's constitutionality is sorted out.

### VII.   Security

Under Federal Rule of Civil Procedure 65(c), a district court may grant a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). In these proceedings, the State has not requested security in the event this Court grants a preliminary injunction nor is there evidence regarding whether, or in what amount, the State will be financially harmed if the Court grants a preliminary injunction. For these reasons, the Court declines to require security from Tofurky.

### VIII.   Conclusion

For the foregoing reasons, the Court finds that Tofurky has met its burden under *Dataphase* to justify the grant of a preliminary injunction enjoining enforcement of the six provisions of Act 501 challenged by Tofurky and as applied to Tofurky:  Arkansas Code Annotated §§ 2-1-305(2), (5), (6), (8), (9), and (10). Thus, the Court grants Tofurky's motion for preliminary injunction to this extent (Dkt. No. 17). The Court hereby orders that defendants, and all those acting in concert with them, including their employees, agents, and successors in office, are preliminarily enjoined from enforcing the six provisions of Act 501 challenged by Tofurky and as applied to Tofurky: Arkansas Code Annotated §§ 2-1-305(2), (5), (6), (8), (9), and (10). This preliminary injunction remains in effect until further order from this Court. No party is barred from seeking modified or additional relief.

It is so ordered this 11th day of December, 2019.

Kristine G. Baker
United States District Judge