**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**TURTLE ISLAND FOODS SPC**                                          **PLAINTIFF**
**d/b/a TOFURKY COMPANY**

**v.**                                    **Case No. 4:19-cv-00514-KGB**

**NIKHIL SOMAN in his official capacity**
**as Director of the Arkansas Bureau of Standards**              **DEFENDANT**

<u>**ORDER**</u>

Turtle Island Foods SPC, d/b/a The Tofurky Company ("Tofurky") brings this action

seeking declaratory and injunctive relief under 42 U.S.C. § 1983 to challenge the constitutionality

of Arkansas Act 501, Arkansas Code Annotated § 2-1-301, *et seq*. ("Act 501") (Dkt. Nos. 31, ¶¶

1, 3; 43, at 1).  Specifically, Tofurky challenges six provisions from Act 501, Arkansas Code

Annotated § 2-1-305(2), (5), (6), (8), (9), and (10) (Dkt. No. 44, at 1).  Tofurky asserts that these

provisions represent a restriction on commercial speech that prevents companies from sharing

truthful and non-misleading information about their products, does nothing to protect the public

from potentially misleading information, and creates consumer confusion where none existed

before in order to impede competition (Dkt. No. 31, ¶ 2).  As such, Tofurky claims that Act 501

violates the Free Speech Clause of the First Amendment and the Due Process Clause of the

Fourteenth Amendment (*Id*.).[1]

This Court previously entered a preliminary injunction Order determining that Tofurky has

Article III standing to bring this legal challenge (Dkt. No. 25, at 8–12); that this Court should not

abstain from addressing the constitutionality of Act 501 (Dkt. No. 25, at 12–15); and that Tofurky

---

[1]  In its original complaint, Tofurky asserted a dormant Commerce Clause claim (Dkt. No.
1).  Tofurky removed the dormant Commerce Clause claim from its first amended complaint for
declaratory and injunctive relief (Dkt. No. 31).

met its burden to justify the grant of a preliminary injunction enjoining the State from enforcing the challenged provisions of Act 501 as applied to Tofurky:  Arkansas Code Annotated § 2-1-305(2), (5), (6), (8), (9), and (10) (Dkt. No. 25, at 16–34).  Later, the parties jointly moved to consolidate the preliminary injunction hearing with the trial on the merits (Dkt. No. 40).  The Court granted the parties' joint motion, but because Tofurky asserted that it was entitled to all of the relief identified in its amended complaint, including facial declaratory and injunctive relief, the Court permitted both parties to address the request for additional relief in supplemental briefing (Dkt. No. 42).

For the following reasons and for those reasons explained in its preliminary injunction Order, the Court determines that Tofurky has Article III standing to bring this legal challenge (Dkt. No. 25, at 8–12); that this Court should not abstain from addressing the constitutionality of Act 501 (Dkt. No. 25, at 12-15); and that Tofurky meets its burden to justify the grant of an injunction consistent with the terms of this Order enjoining the State from enforcing the challenged provisions of Act 501 as applied to Tofurky:  Arkansas Code Annotated § 2-1-305(2), (5), (6), (8), (9), and (10) (Dkt. No. 25, at 16–34).  The  Court grants, in part, and denies, in part, Tofurky's request for facial declaratory and injunctive relief consistent with the terms of this Order (Dkt. Nos. 31, 43).

## I.     Procedural Background

Tofurky filed its complaint on July 22, 2019 (Dkt. No. 1).  Act 501 took effect on July 24, 2019.  *See* Ark. Code Ann. § 2-1-305.  The State filed its answer to Tofurky's complaint (Dkt. No. 13).  Though the complaint mentioned a motion for a preliminary injunction, Tofurky separately moved for preliminary injunction (Dkt. No. 14).  Along with its motion for preliminary injunction, Tofurky included a declaration from Jamie Athos, President and Chief Executive Officer of Tofurky; a declaration from Marcus Onley, Policy Coordinator at The Good Food Institute; a

declaration from Candice Misenheimer, a legal assistant at the law firm of James, Carter & Priebe, LLP; and a brief in support of the motion (Dkt. Nos. 14-1, 14-2, 14-3, 15).  The State filed a response in opposition to Tofurky's motion for preliminary injunction (Dkt. No. 17).  Along with its response in opposition, the State included a copy of Act 501 and a declaration from Mr. Soman (Dkt. Nos. 17-1, 17-2).  Although the Court conducted a hearing on the motion, the parties presented only argument at that hearing, no additional evidence.

The Court entered an Order granting Tofurky's motion for a preliminary injunction on its as applied challenge on December 11, 2019 (Dkt. No. 25).

Tofurky filed an amended complaint for declaratory and injunctive relief ("the operative complaint") on April 15, 2020 (Dkt. No. 31).  The operative complaint removed Tofurky's Dormant Commerce Clause claim and corrected a typographical error (Dkt. No. 29).  The State answered the operative complaint on April 16, 2020 (Dkt. No. 32).

On September 23, 2020, the parties filed a joint motion, pursuant to Federal Rule of Civil Procedure 65(a)(2), asking the Court to consolidate the preliminary injunction proceedings with the trial on the merits (Dkt. No. 40).  The parties stipulated "that no discovery is necessary and agreed that the record before the Court on Plaintiff's motion for preliminary injunction is sufficient for the entry of a final order and judgment related to the six provisions of Act 501 challenged by Plaintiff here." (*Id.*, at 1).  Tofurky acknowledged that the Court limited its preliminary injunction analysis to its as-applied claim, but in the joint motion Tofurky requests all the relief identified in the amended complaint including facial declaratory and injunctive relief (*Id.*, at 2).  The State respectfully disagreed with the Court's resolution of the preliminary injunction motion and preserved its rights of appeal (*Id.*, at 3).  The Court granted the parties' joint motion to consolidate

the preliminary injunction proceedings with the trial on the merits and set a schedule for the parties to provide the Court with supplemental briefing (Dkt. No. 42).

Tofurky filed a supplemental memorandum in support of its request for facial declaratory and injunctive relief (Dkt. No. 43).  Tofurky asks the Court to:  (1) declare that Arkansas Code Annotated § 2-1-305(6), (8), (9), and (10) facially violate the First Amendment; (2) declare that Arkansas Code Annotated § 2-1-305(10) facially violates the Fourteenth Amendment's Due Process Clause; (3) permanently enjoin the State from enforcing Arkansas Code Annotated § 2-1-305(6), (8), (9), and (10); (4) declare that Arkansas Code Annotated § 2-1-305(2) and (5) violate the First Amendment as applied to the labels in the record and similar materials; and (5) permanently enjoin the State from enforcing Arkansas Code Annotated § 2-1-305(2) and (5) as applied to the labels in the record and similar materials (Dkt. No. 43, at 15–16).  The State responded asking that the Court find that the challenged provisions of the Act do not violate the First Amendment or the Fourteenth Amendment's Due Process Clause and that the Court deny Tofurky's request for declaratory and injunctive relief (Dkt. No. 44, at 21).

## II.      Findings Of Fact

Tofurky is a social purpose corporation incorporated in the State of Washington and headquartered in Hood River, Oregon (Dkt. No. 1, ¶ 7).  Mr. Soman is the Director of the Arkansas Bureau of Standards ("the Bureau"), a division of the Arkansas Department of Agriculture (*Id.*, ¶ 10).

Tofurky develops, produces, markets, and sells plant-based food products, including plant-based meats (*Id.*, ¶ 9; Dkt. No. 14-1, ¶ 3).  All of Tofurky's products are vegan (Dkt. No. 14-1, ¶ 1).  Plant-based meats are typically made from soy, tempeh, wheat, jackfruit, textured vegetable protein, or other vegan ingredients (*Id.*, ¶ 3).  The texture, flavor, and appearance of plant-based

meats resembles meat products made from slaughtered animals (*Id.*).  Unlike animal-based meats, however, plant-based meats are made from vegan ingredients (*Id.*).  The products are marketed and sold nationwide, including throughout Arkansas (*Id.*, ¶¶ 3, 9).  Tofurky is one of many companies selling plant-based food products in stores throughout the country, including Arkansas (Dkt. Nos. 15, at 3; 14-1, ¶ 9).

The panel of seven Tofurky labels that are in the record before the Court "fairly and accurately depicts the primary display panel of some of Tofurky's plant-base meat products" (Dkt. Nos. 14-1, ¶ 4; 14-1, at 6–7 (panel of seven Tofurky labels)).

Tofurky uses traditional meat-based terms like "chorizo," "ham roast," and "hot dogs," alongside qualifiers like "all vegan," "plant based," "vegetarian," and "veggie," to show that its products are plant-based meats that can be served and consumed just like any other meats (Dkt. Nos. 14-1, ¶ 5; 17, at 2).  Tofurky believes that its current packaging and marketing materials accurately convey the nature and contents of its plant-based meat products (Dkt. No. 14-1, ¶ 25).  Tofurky includes a list of ingredients and nutritional information on every product package (*Id.*, ¶ 8).  The dispute regarding Act 501 notwithstanding, Tofurky's products, including its plant-based meat products, comply with federal food labeling regulations as well as numerous state and federal laws that prohibit false and deceptive labeling and marketing for food products and consumer products more generally (*Id.*, ¶ 12).  Tofurky has never been the subject of enforcement action by any federal agency for marketing or labeling its products in a misleading manner (*Id.*, ¶ 13).  Tofurkey is not aware of a single consumer communication sent to Tofurky or to any government agency complaining that a consumer mistakenly believed Tofurky's plant-based meat products were, or contained meat, from slaughtered animals (*Id.*, ¶ 10).

Tofurky has invested significant time and resources to develop packaging and marketing materials that effectively, truthfully, and non-deceptively promote its plant-based meat products (*Id.*, ¶ 11). Each package design of Tofurky products is vetted internally and by third parties (*Id.*).

Tofurky asserts that it cannot accurately and effectively describe its products without comparison to the conventional meat products with flavor profiles Tofurky's products are designed to invoke (Dkt. No. 31, ¶ 46). Tofurky distinguishes its plant-based meat products from animal-based meat products through marketing and packaging (Dkt. No. 14-1, ¶ 6). Tofurky does not want to deceive consumers into believing its plant-based meats are made from animals (*Id.*, ¶ 7). To the contrary, Tofurky's packaging and marketing materials includes prominent qualifiers and descriptors showing that its plant-based meat products are not made from animals (*Id.*). The value proposition Tofurky offers consumers is that its products are plant based (*Id.*).

In 2019, the Arkansas General Assembly passed Act 501, which took effect on July 24, 2019. *See* Ark. Code Ann. § 2-1-305. In relevant part, Act 501 states:

> A person shall not misbrand or misrepresent an agricultural product that is edible by humans, including without limitation, by:
>
> . . .
>
> (2) Selling the agricultural product under the name of another food;
>
> . . .
>
> (5) Representing the agricultural product as a food for which a definition and standard of identity has been provided by regulations under § 20-56-219 or by the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq., as it existed on January 1, 2019, unless:
>
> > (A) The agricultural product conforms to the definition and standard; and
> >
> > (B) The label of the agricultural product bears the name of the food specified in the definition and standard and includes the common names of

optional ingredients other than spices, flavoring, and coloring present in the food as regulations require;

(6)  Representing the agricultural product as meat or a meat product when the agricultural product is not derived from harvested livestock, poultry, or cervids;

. . .

(8)  Representing the agricultural product as beef or a beef product when the agricultural product is not derived from a domesticated bovine;

(9)  Representing the agricultural product as pork or a pork product when the agricultural product is not derived from a domesticated swine;

(10)  Utilizing a term that is the same as or similar to a term that has been used or defined historically in reference to a specific agricultural product. . . .

Ark. Code. Ann. § 2-1-305.

The stated legislative purpose of the Act is to protect consumers from being misled or confused by false or misleading labeling of agricultural products that are edible by humans.  *Id.* § 2-1-301.  Act 501 defines "agricultural product" as "a horticultural, viticultural, forestry, dairy, livestock, poultry, or bee product or any other farm, ranch, plantation, or range product. . . ."  Ark. Code Ann. § 2-1-302(1).  Act 501 prohibits misbranding or misrepresenting an agricultural product edible by humans by, for example, representing the product as pork or a pork product when the product is not derived from a domesticated swine (Dkt. No. 44, at 3).  *See* Ark. Code Ann. § 2-1-305(9).  Act 501 includes similar prohibitions for products represented as beef (*Id.*).  *See* Ark. Code Ann. § 2-1-305(8).  Act 501 also prohibits a person from representing a food product "as meat or a meat product" when the product is not derived from harvested livestock, poultry, or cervids (*Id.*).  *See* Ark. Code Ann. § 2-1-305(6).  Finally, Act 501 provides that the Director of the Bureau shall:  (1) administer and enforce the Act; (2) promulgate rules to implement the purposes and requirements of the Act; and (3) receive and investigate complaints regarding alleged violations of the Act and the rules promulgated by the Director (*Id.*).  Ark. Code Ann. § 2-1-304.

According to Tofurky, as applied, Act 501 prohibits Tofurky from using words like "meat," "beef," "chorizo," "sausage," and "roast" to describe its plant-based meat products (Dkt. No. 14-1, ¶ 14). Tofurky asserts that Act 501 might even prohibit Tofurky from accurately depicting its products in its marketing and on its packaging (*Id.*). The statute provides no exception for plant-based meat producers that clearly identify their products as being vegetarian, vegan, or made from plants (*Id.*).

Each individual violation of Act 501 is punishable by a civil penalty of up to $1,000 (*Id.*, ¶ 15). *See* Ark. Code Ann. § 2-1-306. Given the volume of Tofurky's business in Arkansas, Tofurky fears that it is exposed to ruinous civil liability under Act 501 (Dkt. No. 14-1, ¶ 15). Tofurky alleges that Act 501 leaves it with four choices: (1) risk massive civil penalties, along with all of the harms that result from being penalized, by continuing its current marketing and packaging practices; (2) create specialized marketing and packaging practices just for the state of Arkansas, including attempting to police spillover from marketing in nearby states; (3) change its marketing and packaging practices nationwide; or (4) refrain from marketing or selling its products in Arkansas at all (*Id.*, ¶ 16).

Tofurky estimates that the cost of changing its marketing and packaging practices nationwide would verge on $1,000,000, and even still it might be impossible to ensure that no nationwide marketing enters Arkansas (*Id.*, ¶ 17). Further, Tofurky alleges that it is logistically and financially impractical to create separate products to be sold within Arkansas alone (*Id.*, ¶ 18). Instead, Tofurky claims it would be forced to stop selling products in the entire region (*Id.*). Due to the nature of distribution agreements, Tofurky states that it cannot ensure that Tofurky products would not cross state lines into Arkansas (*Id.*). Tofurky represents that any of these options would be a significant burden, cost a considerable amount of money, and cause tangible market disadvantages (*Id.*, ¶¶ 19–20). Additionally, Tofurky fears that it may be liable for media

advertising in other states that spills over into Arkansas markets, including regional and national advertising that reaches Arkansas consumers through print, television, radio, and the internet (*Id.*, ¶ 21).

Finally, Tofurky believes that compliance with Act 501 may create bad will for Tofurky as customers may be confused by the language required to comply with the statute (*Id.*, ¶ 22). If Tofurky is prohibited from using terms like "burger," "chick'n," and "sausage," customers may not understand what they are buying (*Id.*). Tofurky believes this might lead customers to be frustrated with the unavailability of its plant-based meat products in Arkansas or puzzled about why its products are called different names and packaged differently in Arkansas (*Id.*, ¶ 23). Tofurky alleges that the loss of goodwill from its customers would be a significant burden for Tofurky (*Id.*, ¶ 24).

According to Mr. Soman, because Tofurky challenged the constitutionality of specific provisions of Act 501 before they became effective, the Bureau has not taken steps to enforce the provisions of Act 501 challenged by Tofurky (Dkt. No. 17-2, ¶ 6). Mr. Soman represents that the Bureau has also not begun the process of promulgating rules related to implementing the purposes and requirements of the challenged portions of Act 501 (*Id.*). According to Mr. Soman, to avoid unnecessarily expending departmental resources and the efforts of the Bureau's staff, the Bureau does not intend to begin enforcement of the subsections of Act 501 challenged by Tofurky in this case until such time as Tofurky's constitutional challenge to those provisions is resolved (*Id.*, ¶ 7). To that end, Tofurky has not been assessed a civil penalty or fined under Act 501, and the Bureau has not taken steps to begin penalizing or fining Tofurky under Act 501 (*Id.*, ¶ 8). Additionally, according to Mr. Soman, it did not appear at the time the State responded to Tofurky's motion for

preliminary injunction that Tofurky had removed any of its products from stores in Arkansas as a result of Act 501 or changed its labeling or marketing practices within the State (*Id.*, ¶ 9).

At the time the State filed its response to Tofurky's motion for preliminary injunction, according to Mr. Soman, and at the time the State filed its response to Tofurky's supplemental memorandum in support of its request for facial declaratory and injunctive relief, the Bureau had not and still has not taken steps to enforce the provisions of Act 501 (Dkt. Nos. 44, at 3–4; 17-2, ¶¶ 6–7). Tofurky still has not been assessed a civil penalty or fined under the Act, and the Bureau still has not taken steps to begin penalizing or fining Tofurky under the Act (Dkt. No. 44 at 4; 17-2, ¶ 8). The Bureau had not and has not begun the process of promulgating rules related to implementing the purposes and requirements of the challenged portions of Act 501 (Dkt. No. 44, at 14–15; 17-2, ¶ 6).

As of the date the Court entered its preliminary injunction Order, the parties had not entered into a non-prosecution agreement, and the State had not represented that Tofurky will not face retroactive liability as a result of continued violations of Act 501 between its date of enactment and the ultimate resolution of Tofurky's constitutional challenge. At this time, the Court understands this still to be the case.

## III.     Article III Standing

The State contends that Tofurky lacks standing to assert its claims (Dkt. No. 17, at 6–9). For the foregoing reasons, the Court finds that Tofurky has proper standing to assert its claims.

### A.     Legal Standard

Under Article III of the Constitution of the United States, federal courts only have subject matter jurisdiction over "cases" and "controversies." U.S. Const., art. III, § 2; *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). If there is no case or controversy, then a court does

not have subject matter jurisdiction and must dismiss the action.  To be a case or controversy, the dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests."  *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–241 (1937) (citations omitted).

Furthermore, the dispute must be "real and substantial" and request "specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."  *Id.* (citations omitted).

To establish Article III standing, a plaintiff must satisfy three requirements:  "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotes and citations omitted).

The injury-in-fact requirement helps to ensure that a plaintiff has a "personal stake in the outcome of the controversy."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  For an injury to be "particularized," it must affect the plaintiff in a personal and individual way.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citations omitted).  A "concrete" injury must be "de facto," which means it cannot be abstract but must actually exist.  *Spokeo, Inc.*, 578 U.S. at 340 (citing Black's Law Dictionary 479 (9th ed. 2009)).  The party invoking federal jurisdiction bears the burden of establishing standing. *Lujan*, 504 U.S. at 561.

11

As relevant here, "[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (citing *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)).  In making the required showing, however, a plaintiff "need not expose itself to arrest or prosecution in order to challenge" a statute.  *St. Paul Area Chamber of Commerce v. Gaertner*, 439 F.3d 481, 485 (8th Cir. 2006).  Nor must a plaintiff "await the consummation of threatened injury to obtain preventive relief." *Babbitt*, 442 U.S. at 298 (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923)).  In particular, "[w]hen a statute is challenged by a party who is a target or object of the statute's prohibitions, 'there is ordinarily little question that the [statute] has caused him injury.'"  *Gaertner*, 439 F.3d at 485 (quoting *Minn. Citizens Concerned for Life v. Fed. Election Comm'n*, 133 F.3d 129, 131 (8th Cir. 1997)).  Moreover, a sufficient injury "is usually found if the regulation imposes costly, self-executing compliance burdens or if it chills protected First Amendment activity."  *Minn. Citizens Concerned for Life*, 133 F.3d at 132 (citations omitted).

In *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789 (8th Cir. 2016), the Eighth Circuit Court of Appeals examined standing in the context of a First Amendment challenge to a Missouri law regulating the formation of campaign committees, punishable by the threat of civil penalties.  The Eighth Circuit explained that, in the First Amendment context, "two types of injuries may confer Article III standing to seek prospective relief." *Klahr*, 830 F.3d at 794 (quoting *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003) (citing *Mangual v. Rotger–Sabat*, 317 F.3d 45, 56 (1st Cir. 2003))).  A party may establish standing by alleging "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Klahr*, 830 F.3d at 794 (quoting *Babbitt*,

442 U.S. at 298); *see also Rodgers v. Bryant*, 942 F.3d 451, 454–455 (8th Cir. 2019) (explaining that a law's "chilling effect" can create standing)). Second, a party can establish standing by alleging that it self-censored. *Klahr*, 830 F.3d at 794 (citing *281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011)). "[A] First Amendment plaintiff who faces a credible threat of future prosecution suffers from an ongoing injury resulting from the statute's *chilling effect* on his desire to exercise his First Amendment rights." *Ward*, 321 F.3d at 1267 (internal quotations omitted) (emphasis in original). Indeed, "when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged." *Klahr*, 830 F.3d at 794 (quoting *Secretary of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984)). The Eighth Circuit applied these same principles to evaluate standing in *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699–700 (8th Cir. 2021).

### B.   Analysis Of Standing

The State argues that Tofurky has not met its threshold burden of establishing that it has standing to challenge Act 501 (Dkt. No. 17, at 8). The State makes a multi-pronged argument, asserting that: Tofurky has not been assessed a civil penalty or fine under Act 501; the Bureau has not taken steps to begin penalizing or fining Tofurky under Act 501; Tofurky has not alleged that it has taken any steps to remove its products from stores in Arkansas; Tofurky has not alleged that it has taken any steps to change its marketing practice for fear of Act 501's mandates; and Tofurky does not appear to have removed any of its products or changed its labeling practices (*Id.*, at 8–9). In the State's estimation, these combined factors prove that Tofurky is not faced with "a credible threat of prosecution" that is sufficiently imminent under Act 501, robbing Tofurky of standing to challenge Act 501 (*Id.*, at 9). *See Driehaus*, 573 U.S. at 159.

13

The State's arguments regarding standing misunderstand what Tofurky must show to demonstrate appropriate standing. In a pre-enforcement suit, "a plaintiff satisfies the injury-in-fact requirement," and thus has standing, "where [it] alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Driehaus*, 573 U.S. at 159 (quoting *Babbitt*, 442 U.S. at 298); *see also Thompson*, 992 F.3d at 699–700.

No party argues that Tofurky's advertisements and labels do not fall within the scope of Act 501. At no time has the State taken that position in this litigation. Act 501 refers to "agricultural product" in the challenged sections, and that phrase is defined in Act 501 as "a horticultural, viticultural, forestry, dairy, livestock, poultry, or bee product or any other farm, ranch, plantation, or range product. . . ." Ark. Code Ann. § 2-1-302(1).

Tofurky challenges only six specific provisions of Act 501: Arkansas Code Annotated § 2-1-305(2), (5), (6), (8), (9), and (10) (Dkt. No. 14, at 1). The Court confines its analysis to those six provisions and determines whether Tofurky has shown injury, causation, and redressability with respect to each provision it challenges. *See Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006) (citing *Lujan*, 504 U.S. at 560). Further, Tofurky brings this pre-enforcement First Amendment challenge alleging fear of prosecution under Act 501 has caused and will continue to cause a chilling effect, resulting in Tofurky self-censoring its labels and marketing materials or experiencing other harms as outlined in the record evidence.

Mr. Soman has not yet promulgated regulations to implement Act 501,[2] and the parties have represented that the State does not intend to take any enforcement action against Tofurky

---

[2] Nothing in this Court's preliminary injunction Order prohibited Mr. Soman, or anyone acting in concert with him, from promulgating such regulations. The Court's preliminary injunction was limited to enjoining the challenged provisions of Act 501 as to Tofurky only, and

during the pendency of this litigation (Dkt. No. 17-2, ¶ 7).  The Court also notes that Tofurky has

not been assessed a civil penalty or fine under Act 501 and that the Bureau has not taken steps to

begin penalizing or fining Tofurky under Act 501 (Dkt. No. 17-2, ¶ 8).

      The parties address these arguments with respect to injury-in-fact sufficient for standing,

but these arguments also relate to ripeness.  Courts assess ripeness through a two-fold test,

"evaluat[ing] both the fitness of the issues for judicial decision and the hardship to the parties of

withholding court consideration."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated

by Califano v. Sanders*, 430 U.S. 99 (1977).  Although no regulations have been promulgated, the

inquiry raised by Tofurky's challenge to Act 501 is fundamentally a question of law.  *See

Thompson*, 992 F.3d at 700 ("[B]ecause Plaintiffs' claim 'is largely a legal question' and involves

the chill of 'allegedly protected First Amendment expression,' it is ripe for adjudication."); *281

Care Comm.*, 638 F.3d at 631 (explaining the ripeness standard); *see also Kimberly-Clark Corp.

v. Dist. of Columbia*, 286 F. Supp. 3d 128, 137 (D.D.C. 2017) (examining similar facts and

arguments in a First Amendment challenge to a municipal ordinance).

      Moreover, upon conclusion of this litigation, the State could retroactively levy civil

penalties of up to $1,000 against Tofurky for each statutory violation that occurs between the

passage of Act 501 and this litigation's resolution (Dkt. No. 15, at 3).  *See* Ark. Code Ann. § 2-1-

306.  Though the bill might not come due until the end, Tofurky faces the credible threat of running

up its tab in the meantime.  Given the possible $1,000 penalty per item and the vast number of

Tofurky products in Arkansas currently out of compliance with Act 501, Tofurky convincingly

asserts that such liability exposure would be "ruinous" (Dkt. No. 15, at 4).  The State "has not

---

the Court directed the parties to file a status report with the Court immediately if Mr. Soman, or
anyone acting in concert with him, promulgated regulations pursuant to Act 501 (Dkt. No. 25, at
10 n.2).

argued to this Court that plaintiffs will not be prosecuted" if they continue to act in contravention of Act 501. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16 (2010) (citations omitted). There is nothing stopping the State from simply changing its mind and deciding to prosecute Tofurky during the pendency of this litigation, despite its expressed intention thus far to postpone any enforcement until the resolution of Tofurky's constitutional challenge. *See Rodgers*, 942 F.3d at 455 (examining and rejecting similar arguments); *Gaertner*, 439 F.3d at 485 (stating that "fear of prosecution is not imaginary or speculative" when the law, "on [its] face," prohibits the plaintiffs' conduct). Thus, the credible threat of incurring significant liability for continued actions in violation of Act 501 demonstrates sufficient injury and ripeness to grant Tofurky standing.

The State's arguments regarding Tofurky's failure to remove its products from Arkansas stores, change its marketing practices, or change its labeling practices fall flat, as well (Dkt. No. 17-2, ¶ 9). In essence, in order to show standing, the State would have Tofurky "design, produce, and distribute different, specialized marketing and packaging for its products when they will be sold in the state of Arkansas, creating a logistical nightmare in distribution channels that service neighboring states," "change the entirety of its marketing and packaging nationwide to comply with the Act, at considerable expense," or "refrain from marketing or selling its products in Arkansas at all" (Dkt. Nos. 1, ¶ 54; 14-1, ¶¶ 15–25; 31, ¶ 54). Such drastic measures from Tofurky would certainly represent adhering to a "regulation [that] imposes costly, self-executing compliance burdens." *Minn. Citizens Concerned for Life*, 133 F.3d at 132 (citations omitted). Moreover, there is sufficient proof in the record before the Court that Tofurky has established standing by alleging "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Klahr*, 830 F.3d at 794; *Rodgers*, 942 F.3d at 454–455.

For all of these reasons, the Court concludes that Tofurky has standing to pursue the relief it seeks.

## IV.    Abstention

The State also contends that the Court should abstain from addressing the constitutionality of Act 501 and defer to the authority of Arkansas' state courts to interpret the law (Dkt. No. 17, at 9–10).  For the following reasons, the Court finds that abstention would be improper in this case.

### A.    Legal Standard

"[F]ederal courts have a virtually unflagging obligation . . . to exercise the jurisdiction given to them."  *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817-18 (1976) (citations omitted).  However, this obligation is not "absolute."  *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (citing *Canada Malting Co. v. Paterson S.S., Ltd.*, 285 U.S. 413, 422 (1932)).  Abstention doctrine provides that "federal courts may decline to exercise their jurisdiction, in otherwise 'exceptional circumstances,' where denying a federal forum would clearly serve an important countervailing interest."  *Id.* (quoting *Colorado River*, 424 U.S. at 813).  Notably, the Supreme Court has stated that abstention is "the exception and not the rule," and the Court "[has] been particularly reluctant to abstain in cases involving facial challenges based on the First Amendment."  *City of Houston, Tex. v. Hill*, 482 U.S. 451, 467 (1987) (footnote and internal citations omitted).

Rather than invoking any of the traditional abstention doctrines, the State summarily argues that the Court should allow the Arkansas Supreme Court to have the first opportunity to consider the constitutionality of Act 501 (Dkt. No. 17, at 10).  This generalized argument seems to be an unspecified request for *Pullman* abstention.  Though there are several abstention doctrines, the *Pullman* abstention doctrine covers actions to enjoin state or local officers from enforcing an

17

allegedly unconstitutional state law.  *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941).  "[T]he purpose of *Pullman* abstention in such cases is to avoid resolving the federal question by encouraging a state-law determination that may moot the federal controversy."  *San Remo Hotel, L.P. v. City and Cnty. of San Francisco, Cal.*, 545 U.S. 323, 349 (2005) (citing *England v. La. State Bd. of Med. Exam'rs.*, 375 U.S. 411, 416–417 (1964)).  Thus, in situations "[w]here resolution of the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law, abstention may be proper in order to avoid unnecessary friction in federal[-]state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication."  *Harman v. Forssenius*, 380 U.S. 528, 534 (1965).  However, "[t]he mere possibility that a state's interpretation of its law may avoid the necessity for an injunction does not preclude federal review."  *Middle S. Energy, Inc. v. Ark. Pub. Serv. Comm'n*, 772 F.2d 404, 413 (8th Cir. 1985).  "The [*Pullman*] abstention doctrine is not an automatic rule applied whenever a federal court is faced with a doubtful issue of state law; it rather involves a discretionary exercise of a court's equity powers."  *Baggett v. Bullitt*, 377 U.S. 360, 375 (1964).  Importantly, this "abstention rule only applies where 'the issue of state law is uncertain.'"  *Wisconsin v. Constantineau*, 400 U.S. 433, 439 (1971) (quoting *Harman*, 380 U.S. at 534).  "Where there is no ambiguity in the state statute, the federal court should not abstain but should proceed to decide the federal constitutional claim."  *Id.* (citing *Zwickler v. Koota*, 389 U.S. 241, 250-51 (1967)).

### B.      Analysis Of Abstention

In support of its abstention argument that the Court should allow the Arkansas Supreme Court to have the first opportunity to consider the constitutionality of Act 501, the State cites three cases: *Virginia v. American Booksellers Association, Inc*., 484 U.S. 383 (1988), *Erznoznik v. City*

*of Jacksonville*, 422 U.S. 205 (1975), and *United Food and Commercial Workers International Union, AFL-CIO, CLC v. IBP, Inc*., 857 F.2d 422 (8th Cir. 1988) (Dkt. No. 17, at 9–10). The State cites these three cases for the proposition that, if a facially-challenged statute is "'readily susceptible' to a narrowing construction that would make it constitutional, it will be upheld." *Am. Booksellers Ass'n*, 484 U.S. at 397 (citing *Erznoznik*, 422 U.S. at 216; *Broadrick v. Oklahoma*, 413 U.S. 601 (1973)); *see also Erznoznik*, 422 U.S. at 216 ("[T]he Court has held that a state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts." (citing *Dombrowski v. Pfister*, 380 U.S. 479, 497 (1965))); *IBP*, 857 F.2d at 431 (same). These cases also posit that state courts are more appropriately situated than federal courts to fashion these narrowing constructions. *Am. Booksellers Ass'n*, 484 U.S. at 397 (certifying construction of contested state statutes to the Virginia Supreme Court); *Erznoznik*, 422 U.S. at 216 (stating that a narrowing construction by the state courts can rescue a state statute from facial invalidation); *IBP*, 857 F.2d at 431 (stating that federal courts "may not impose [their] own narrowing construction . . . if the state courts have not already done so" (internal quotations and citation omitted)).

However, the State proffers no narrowed construction of Act 501 that would avoid the constitutional questions plaguing the law. The Court does not see how Act 501, straightforward as it is, could be "readily susceptible" to a narrowed construction that skirts the constitutional questions in this case. *See Erznoznik*, 422 U.S. at 216–217 ("In the present case the possibility of a limiting construction appears remote . . . . Moreover, the [law] by its plain terms is not easily susceptible of a narrowing construction . . . . In these circumstances, . . . there is no reason to assume that the [law] can or will be decisively narrowed."). Here, "the naked question, uncomplicated by an unresolved state law, is whether the Act on its face is unconstitutional."

*Constantineau*, 400 U.S. at 439.  Given the lack of ambiguity in Act 501, the Court declines to apply abstention and proceeds to examine the constitutional claims.

### V.       Challenges To Act 501

#### A.       Legal Standard For Relief

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction," subject to some exceptions not at issue here, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).

"There is no clear-cut standard to use in determining whether a court should exercise its discretion to grant declaratory relief." *Bd. of Regents for Northwest Mo. State Univ. v. MSE Corp.*, Case No. 90-0125-cv-W-9, 1990 WL 212098, *2 (W.D. Mo. Nov. 20, 1990).  "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).  In general, courts should exercise their discretion in such a way as "to strike a proper balance between the needs of the plaintiff and the consequences of giving the desired relief. . . .  The actuality of the plaintiff's need for a declaration of his rights is therefore of decisive importance." *Eccles v. Peoples Bank of Lakewood Vill., Cal.*, 333 U.S. 426, 431–432 (1948).

"The standard for issuing a preliminary or permanent injunction is essentially the same, excepting one key difference.  A permanent injunction requires the moving party to show actual success on the merits, rather than the fair chance of prevailing on the merits required for a standard

preliminary injunction." *Oglala Sioux Tribe v. C & W Enter., Inc.*, 542 F.3d 224, 229 (8th Cir. 2008). "A court must consider the following factors in determining whether to issue a permanent injunction:  (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties; (3) whether the movant proves actual success on the merits; and (4) the public interest." *Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008) (quoting *Forest Park II v. Hadley*, 336 F.3d 724, 731 (8th Cir. 2003) (citing *Bank One, Utah v. Guttau*, 190 F.3d 844, 847 (8th Cir. 1999) (adapting the preliminary injunction factors announced in *Dataphase Sys., Inc. v. C.L. Sys., Inc.,* 640 F.2d 109, 113 (8th Cir. 1981), to a review of a permanent injunction)).

In its motion for preliminary injunction, Tofurky challenged six provisions from Act 501, Arkansas Code Annotated § 2-1-305(2), (5), (6), (8), (9), and (10), as violating the Free Speech Clause of the First Amendment and the Due Process Clause of the Fourteenth Amendment (Dkt. No. 1, ¶ 2).  The Court considered Tofurky's likelihood of success on the merits of its First Amendment claim, determined that Tofurky had demonstrated that it was likely to prevail on the merits of its First Amendment claim as applied, and therefore declined to reach the merits of Tofurky's Fourteenth Amendment claim (Dkt. No. 25).  The Court now determines whether Tofurky is entitled to the relief it seeks at this stage of the proceeding.

### B.      Overview Of First Amendment Challenges

Tofurky brings both an as-applied and facial First Amendment challenge to Act 501 (Dkt. No. 31, ¶ 63).  In its most recent filing, Tofurky seeks a declaration that Arkansas Code Annotated § 2-1-305(6), (8), (9), and (10) are facially unconstitutional and, therefore, asks the Court to enjoin permanently the State from enforcing the challenged provisions, not restricting this relief to Tofurky.

In regard to facial challenges in general, the majority of courts have adopted a definition of facial challenges as those seeking to have a statute declared unconstitutional in all possible applications.  *See, e.g., Sabri v. United States*, 541 U.S. 600, 609 (2004); *United States v. Salerno*, 481 U.S. 739, 745 (1987); *Steffel v. Thompson*, 415 U.S. 452, 474 (1974).  As-applied challenges are construed as an argument that the statute is unconstitutional as applied to precise plaintiffs.  "Each holding carries an important difference in terms of outcome:  If a statute is unconstitutional as applied, the State may continue to enforce the statute in different circumstances where it is not unconstitutional, but if a statute is unconstitutional on its face, the State may not enforce the statute under any circumstances."  *See Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 193–194 (6th Cir. 1997), *cert. denied*, 523 U.S. 1036 (1998), *abrogated by Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 2228 (June 24, 2022).

The Supreme Court has made clear that as-applied challenges are preferred.  *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 448–451 (2008) (discussing the preference for as-applied challenges as opposed to facial challenges).  In *Salerno*, the Supreme Court stated that a "facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully" and will only succeed if a litigant can "establish that no set of circumstances exists under which the Act would be valid."  481 U.S. at 745; *United States v. Hall*, 44 F.4th 799, 805 (8th Cir. 2022).  The Court begins its analysis by examining Tofurky's as-applied First Amendment challenges to Act 501 and then turns to examine its facial challenges.

### C.    First Amendment:    As Applied Challenge To Arkansas Code Annotated § 2-1-305(6), (8), and (9)

"An as-applied challenge consists of a challenge to the statute's application only as-applied to the party before the court."  *Thompson*, 992 F.3d at 700 (quoting *Republican Party of Minn. v. Klobuchar*, 381 F.3d 785, 790 (8th Cir. 2004)).  In the operative complaint, Tofurky asserts that

the Act violates the First Amendment as applied to Tofurky (Dkt. No. 31, ¶ 63).  Tofurky seeks a declaration that the Act's provisions are unconstitutional as applied to Tofurky and requests that the Court grant a permanent injunction preventing the enforcement of the Act's challenged provisions as applied to Tofurky (Dkt. No. 31, at 15).  Accordingly, the Court will consider whether Arkansas Code Annotated § 2-1-305(6), (8), and (9) are unconstitutional as applied to Tofurky based on the operative complaint and the parties' briefing.

### 1.      Success On The Merits:  Legal Standard

Commercial speech is generally defined in one of two ways:  "expression related solely to the economic interests of the speaker and its audience," or "speech proposing a commercial transaction."  *Cent. Hudson*, 447 U.S. at 561-62.  "The First Amendment, as applied to the States through the Fourteenth Amendment, protects commercial speech from unwanted governmental regulation."  *Id.* at 561 (citing *Va. Pharmacy Bd. v. Va. Citizens Consumer Council*, 425 U.S. 748, 61-62 (1976)).  In analyzing restrictions on commercial speech, the Supreme Court articulated an intermediate scrutiny framework for commercial speech in *Central Hudson* resulting in a four-part test.[3]  447 U.S. at 765.  Under the *Central Hudson* test, courts "test the constitutionality of laws

---

[3]  The Court notes that the *Central Hudson* test is sometimes referred to as a four-part test and sometimes referred to as a three-part test with a threshold question.  *Compare City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 435 (1993) (Blackmun, J., concurring) ("Under the analysis adopted by the *Central Hudson* majority, misleading and coercive commercial speech and commercial speech proposing illegal activities are addressed in the first prong of the four-part test.") *with Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 624 (1995) ("Commercial speech that falls into neither of those categories, like the advertising at issue here, may be regulated if the government satisfies a test consisting of three related prongs . . . .").  Since the Eighth Circuit appears to consider *Central Hudson* a four-part test, this Court follows the Eighth Circuit's lead in that respect.  *See, e.g., Mo. Broadcasters Ass'n v. Lacy*, 846 F.3d 295, 300 (8th Cir. 2017) ("In *Central Hudson*, the Supreme Court identified four considerations to determine the constitutionality of laws burdening commercial speech . . . ."); *Otto*, 744 F.3d at 1055 ("The well-known *Central Hudson* inquiry, in turn, employs a four-part standard to test the constitutionality of laws burdening commercial speech . . . .").

burdening commercial speech" by considering:  "(1) whether the commercial speech at issue concerns unlawful activity or is misleading; (2) whether the governmental interest is substantial; (3) whether the challenged regulation directly advances the government's asserted interest; and (4) whether the regulation is no more extensive than necessary to further the government's interest." *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1055 (8th Cir. 2014) (citing *Cent. Hudson*, 447 U.S. at 566).  Provided that the speech is not false or inherently misleading, "[e]ach of these latter three inquiries must be answered in the affirmative for the regulation to be found constitutional." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367 (2002); *see also Mo. ex rel. Nixon v. Am. Blast Fax, Inc.*, 323 F.3d 649, 653 (8th Cir. 2003) (same).

The first prong of the *Central Hudson* test "ask[s] as a threshold matter whether the commercial speech concerns unlawful activity or is misleading." *Thompson*, 535 U.S. at 367.  If the speech concerns unlawful activity or is misleading, "then the speech is not protected by the First Amendment." *Id.*  "[W]hen the particular content or method of the advertising suggests that it is inherently misleading . . . the States may impose appropriate restrictions," without violating the First Amendment. *In re R. M. J.*, 455 U.S. 191, 203 (1982).  "'Inherently misleading' speech is speech that 'inevitably will be misleading' to consumers." *Otto*, 744 F.3d at 1056 (quoting *Bates v. State Bar of Ariz.*, 433 U.S. 350, 372 (1977)).  "The 'inherently misleading' character of speech may be inferred from 'the particular content or method of the advertising' as well as from 'experience [that] has proved that in fact such advertising is subject to abuse.'" *Id.* (quoting *R. M. J.*, 455 U.S. at 203).  "Misleading advertising may be prohibited entirely."  *R. M. J.*, 455 U.S. at 203; *see also Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 638 (1985) ("The States and the Federal Government are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading . . . ." (citations omitted)).  However, "[i]f the communication is

24

neither misleading nor related to unlawful activity, the government's power is more circumscribed," and courts proceed with the remainder of the *Central Hudson* analysis. *Cent. Hudson*, 447 U.S. at 564.

The second prong of the *Central Hudson* test requires the State to "assert a substantial interest to be achieved by restrictions on commercial speech." *Cent. Hudson*, 447 U.S. at 564. The State may "show the significance of the harm it seeks to remedy" and "demonstrate the substantiality of the interests with anecdotes, history, consensus, and simple common sense." *Am. Blast Fax*, 323 F.3d at 654 (internal quotations and citations omitted). "[E]mpirical studies" are permitted but not required. *Id.* In considering the State's interest, the Court "must identify with care the interests the State itself asserts." *Edenfield v. Fane*, 507 U.S. 761, 768 (1993). "Unlike rational-basis review, the *Central Hudson* standard does not permit [the Court] to supplant the precise interests put forward by the State with other suppositions." *Id.* (citing *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)). The Court will also consider whether "it appears that the stated interests are not the actual interests served by the restriction." *Id.* (citing *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 730 (1982)).

The third prong of the *Central Hudson* test requires that:

> [T]he speech restriction directly and materially advanc[e] the asserted governmental interest. "This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree."

*Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 188 (1999) (quoting *Edenfield*, 507 U.S. at 770–771); *see also Went For It*, 515 U.S. at 625 ("Under *Central Hudson*'s [third] prong, the State must demonstrate that the challenged regulation advances the Government's interest in a direct and material way." (internal quotations and citations omitted)). "[T]he

regulation may not be sustained if it provides only ineffective or remote support for the government's purpose." *Cent. Hudson*, 447 U.S. at 564.

The fourth prong of the *Central Hudson* test "complements the direct-advancement inquiry of the third, asking whether the speech restriction is not more extensive than necessary to serve the interests that support it." *Greater New Orleans*, 527 U.S. at 188. The Supreme Court has "made clear that 'the least restrictive means' is not the standard; instead, the case law requires a reasonable 'fit between the legislature's ends and the means chosen to accomplish those ends, . . . a means narrowly tailored to achieve the desired objective.'" *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001) (quoting *Went For It, Inc*., 515 U.S. at 632). This prong "is not satisfied if there are alternatives to the regulation[] that directly advance[] the asserted interest in a manner less intrusive to plaintiffs' First Amendment rights." *Mo. Broad. Ass'n v. Lacy*, 846 F.3d 295, 302–303 (8th Cir. 2017) (citing *Rubin v. Coors Brewing Co*., 514 U.S. 476, 490–491 (1995)). However, the State is "not required to show 'the manner of restriction is absolutely the least severe that will achieve the desired end.'" *Id.* at 303 (quoting *Fox*, 492 U.S. at 480).

## 2.     Success On The Merits:  Analysis

Both parties agree that the information on Tofurky's packaging, labeling, and marketing materials represents commercial speech. The parties disagree as to whether that commercial speech merits First Amendment protection. Tofurky asserts that Act 501 unconstitutionally restricts protected commercial speech (Dkt. No. 15, at 6–7). Tofurky further argues that Act 501 does not advance a substantial government interest and is not appropriately tailored to any government interest (*Id.*, at 7–13). The State argues that Tofurky's commercial speech is "inherently misleading" and thus outside the First Amendment's protections (Dkt. No. 17, at 13–17). Additionally, the State argues that, even if Tofurky's commercial speech warrants First

Amendment protection, Act 501 should stand because the State has a substantial interest in regulating the speech, Act 501 directly and materially advances the State's interest, and Act 501's restriction is no more extensive than necessary to advance the State's interest (*Id.*, at 18–23).

The State argues that Tofurky's labels for its plant-based products are inherently misleading because they use the names and descriptors of traditional meat items but do not actually include the product they invoke, including terms like "chorizo," "hot dogs," "sausage," and "ham roast" (Dkt. No. 17, at 15).  Additionally, the State points out that Tofurky designs its food products to approximate the texture, flavor, and appearance of meat derived from slaughtered animals (*Id.*).  The State believes these factors make Tofurky's speech inherently misleading (*Id.*).

Tofurky counters that the State's argument is not plausible as words such as "meat," "burger," and "steak" have been used for decades—and in some cases centuries—to describe foods that are not made from slaughtered animals (Dkt. No. 15, at 7).  Further, Tofurky contends that its labels and marketing materials prominently identify its products variously as "all vegan," "plant based," "vegetarian," "veggie," and "made with pasture raised plants" on the front of the packages of it products (*Id.*).

The parties have chosen not to supplement the record since the preliminary injunction hearing (Dkt. No. 40).  The Court has seven labels before it in the record (Dkt. No. 14-1, at 6–7). These labels are for products the Court will refer to as "Veggie Burger," "Deli Slices," "Chorizo Style Sausage," "Slow Roasted Chick'n," "Original Sausage Kielbasa," "Hot Dogs," and "Vegetarian Ham Roast" (*Id.*).  The panel of seven Tofurky labels that are in the record before the Court "fairly and accurately depicts the primary display panel of some of Tofurky's plant-base meat products" (Dkt. Nos. 14-1, ¶ 4).  There is no evidence in the record challenging these assertions.

Tofurky uses traditional meat-based terms like "chorizo," "ham roast," and "hot dogs," alongside qualifiers like "all vegan," "plant based," "vegetarian," and "veggie," to show that its products are plant-based meats that can be served and consumed just like any other meats (Dkt. Nos. 14-1, ¶ 5; 17, at 2). Tofurky believes that its current packaging and marketing materials accurately convey the nature and contents of its plant-based meat products (Dkt. No. 14-1, ¶ 25). Tofurky includes a list of ingredients and nutritional information on every product package (*Id.*, ¶ 8).

Tofurky asserts that it cannot accurately and effectively describe its products without comparison to the conventional meat products with flavor profiles Tofurky's products are designed to invoke (Dkt. No. 31, ¶ 46). Tofurky distinguishes its plant-based meat products from animal-based meat products through marketing and packaging (Dkt. No. 14-1, ¶ 6). Tofurky does not want to deceive consumers into believing its plant-based meats are made from animals (*Id.*, ¶ 7). To the contrary, Tofurky's packaging and marketing materials includes prominent qualifiers and descriptors showing that its plant-based meat products are not made from animals (*Id.*). The value proposition Tofurky offers consumers is that its products are plant based (*Id.*).

The "Veggie Burger" label has the word "veggie" modifying the word "burger" and includes the words "all vegan" in the middle of the package (Dkt. No. 14-1, at 6). Further, the "Veggie Burger" label features the words "white quinoa" next to a picture of the burger (*Id.*). The "Deli Slices" label also includes the words "all vegan" in the middle of the label, features the words "plant-based" next to a picture of the product, and describes the product as "smoked ham style" (*Id.*) (emphasis added). The "Chorizo Style Sausage" label includes the words "all vegan" and states that the product was "made with pasture raised plants" (*Id.*). The "Slow Roasted Chick'n" label has the words "all vegan" right next to the product's name and describes the product as

"plant-based" in the bottom left corner (*Id.*). The "Original Sausage Kielbasa" label includes the words "all vegan" next to the word "sausage" and identifies the product as "Polish-style wheat gluten and tofu sausages" (*Id.*, at 7). The "Hot Dogs" label has the words "all vegan" next to the word "dogs" and "plant-based" under the word "dogs" (*Id.*). The "Vegetarian Ham Roast" has the word "vegetarian" modifying the words "ham roast (*Id.*). Each of these labels also feature the letter "V" in a circle on the front of the packaging, a common indicator that a food product is vegan or vegetarian (*Id.*, at 6-7). Finally, each of these labels feature the company name "Tofurky," which clearly contains the word "tofu" in a play on the word "turkey" (*Id.*).

In "considering the label as a whole," the Court contemplates whether "an ordinary consumer would [ ] be deceived" as to the nature of the product. *Howard v. Bayer Corp.*, Case No. 4:10-cv-1662-DPM, 2011 WL 13224118, at *2 (E.D. Ark. July 22, 2011); *see also Ocheesee Creamery LLC v. Putnam*, 851 F.3d 1228, 1238-39 (11th Cir. 2017) (reviewing the creamery's label as a whole to conclude that the words "skim milk" on the label were not inherently misleading under *Central Hudson*). Here, the Court concludes that Tofurky prevails on the merits of its argument that that the speech it not inherently misleading. The labels' use of the words Act 501 prohibits permits Tofurky to convey meaningful, helpful information to consumers about the products they are purchasing, and Tofurky's repeated indications that the food products contained in these packages contain no animal-based meat dispel consumer confusion. "[T]his is not a case of key information in minuscule type buried deep among many ingredients." *Howard*, 2011 WL 13224118, at *1 (citation omitted); *see Miyoko's Kitchen v. Ross*, Case No. 20-CV-00893-RS, 2021 WL 4497867, at *6 (N.D. Cal. Aug. 10, 2021) (concluding Miyoko's use of "butter," "lactose free," "cruelty free," and "revolutionizing dairy with plants" on the company's "vegan butter" product labeling is not misleading to consumers); *Ocheesee Creamery LLC*, 851 F.3d at 1233

(holding that restricting truthful use of the words "skim milk" on the label of milk bottles sold in stores could not withstand First Amendment scrutiny); *see also Painter v. Blue Diamond Growers*, 757 F.App'x 517 (9th Cir. 2018) (examining similar issues and rejecting claims for purportedly deceptively labeled almond milk); *Ang v. Whitewave Foods Co.*, Case No. 13-cv-1953, 2013 WL 6492353 (N.D. Cal. Dec. 10, 2013) (observing, when examining claims for allegedly misbranded products, that "adopting Plaintiffs' position [to remove animal-based names] might lead to more confusion, not less.").

The State appears to believe that the simple use of the word "burger," "ham," or "sausage" leaves the typical consumer confused, but such a position requires the assumption that a reasonable consumer will disregard all other words found on the label.  *See, e.g.*, *Ang*, 2013 WL 6492353, at *4 ("Under Plaintiffs' logic, a reasonable consumer might also believe that veggie bacon contains pork, that flourless chocolate cake contains flour, or that e-books are made out of paper.").  That assumption is unsupported by the record.  The labels in the record evidence before the Court include ample terminology to indicate the vegan or vegetarian nature of the products. Additionally, the State has not come forward with evidence of any broad marketplace confusion around plant-based meat alternatives to bolster its claim.  *See Miyoko's Kitchen*, 2021 WL 4497867, at *4-5.  Here, "[t]here is no contention that any [consumer or potential consumer] was actually misled or deceived by" Tofurky's packaging, labeling, or marketing.  *Peel v. Attorney Registration & Disciplinary Comm'n of Ill.*, 496 U.S. 91, 100-01 (1990).  Thus, the Court concludes that "considering the label as a whole, an ordinary consumer would not be deceived about" whether Tofurky's products contain animal-based meat.  *Howard*, 2011 WL 13224118, at *2.

In support of its argument the State points to *Upton's Naturals Co. v. Stitt*, Case No. CIV-20-938-F, 2020 WL 6808784, *3  n.8 (W.D. Okla. Nov. 19, 2020), a case where the United States District Court for the Western District of Oklahoma considered the challenge mounted by Upton's Naturals Co. and Plant Based Foods Association to an Oklahoma Act that prohibits sellers of plant-based meats from using meat terms to describe their foods unless they have a disclaimer—in the same "size and prominence" as their product names—that their products are plant-based (Dkt. No. 44, at 15).  Plaintiffs argued their use of terms like bacon, chorizo, hot dog, jerky, meatballs, and steak were not deceptive because their food labels clearly marked their foods as "meatless," "plant-based," or "vegan" to let consumers know their foods do not contain meat.  *Id*. *4.  The district court concluded, based on the product labels of Upton's Naturals Co. the court reviewed, that the "VEGAN" term or the "100% VEGAN" term did not make the packaging non-misleading, and "the packaging remains potentially misleading to the reasonable consumer."  *Id*.  Based on this conclusion, the district court applied the *Zauderer* level of scrutiny to analyze the Oklahoma Act and denied plaintiffs' motion for preliminary injunction.  *Id*. at *4–5.  Plaintiffs appealed but later voluntarily dismissed their appeal.  *Upton's Naturals Co. v. Stitt*, Case No. 20-6184, 2021 WL 5972086 (June 3, 2021).

The instant case is distinguishable from *Upton's Naturals Co*.  In that case, the district court was considering Upton's Naturals Co.'s packaging and labels and considering an Act that required mandated disclosures when using meat-related terms.  The district court was not, as the Court is in this case, addressing the constitutionality of a speech *restriction* under *Central Hudson*.  For these reasons and for reasons set forth in this Order, the Court rejects the analysis in *Upton's Naturals Co.*

The State also contends here that Act 501 also includes a detailed "Definitions" section that helps to define Act 501's prohibitions. *See* Ark. Code Ann. § 2-1-302; 305. Tofurky's plant-based products are not beef, beef product, livestock, meat, meat product, pork, pork product, or poultry within Act 501's definition of those terms. *See* Ark. Code Ann. § 2-1-302. No party argues that Tofurky's advertisements and labels do not fall within the scope of Act 501. At no time has the State taken that position in this litigation.

Further, even though the State has defined certain terms in Act 501, those definitions do not serve as trademarks on these terms. The Court concludes that the simple use of a word frequently used in relation to animal-based meats does not make use of that word in a different context inherently misleading. *See Miyoko's Kitchen*, 2021 WL 4497867, at *6 (concluding Miyoko's use of "butter," "lactose free," "cruelty free," and "revolutionizing dairy with plants" on the company's "vegan butter" product labeling is not misleading to consumers). In this regard, the facts of this case seem analogous to those of *Ocheesee Creamery LLC v. Putnam*, 851 F.3d 1228 (11th Cir. 2017).

In *Ocheesee*, the Eleventh Circuit considered whether the plaintiffs' use of the term skim milk "was inherently misleading because it conflicted with the State's definition of 'skim milk,' according to which the product would include replenished vitamin A." *Id.* at 1238. The Eleventh Circuit noted that "[i]t is undoubtedly true that a state can propose a definition for a given term. However, it does not follow that once a state has done so, any use of the term inconsistent with the state's preferred definition is inherently misleading." *Id.* As in *Ocheesee*, Tofurky's use of the contested terms deviates from the State's definitions of those terms in Act 501. Those deviations, though, do not render Tofurky's speech inherently misleading based on the labels in the record before the Court.

As a result, Tofurky's labeling is neither unlawful nor inherently misleading, and Tofurky's commercial speech warrants First Amendment protection.   Accordingly, "the State's speech restriction is subject to intermediate scrutiny under the remainder of the *Central Hudson* test." *Ocheesee Creamery*, 851 F.3d at 1240.

As to *Central Hudson*'s second prong, the Court notes that combatting deceptive, misleading, or false advertising is a legitimate and substantial interest recognized by both the Supreme Court and the Eighth Circuit.  *See Zauderer*, 471 U.S. at 651 (holding that "preventing deception of customers" is a substantial interest); *Otto*, 744 F.3d at 1061 (noting the State of Minnesota's "substantial interest in protecting the public from misleading and false advertising"). Given this precedent, the Court assumes, without deciding, that the State has a substantial interest in "protect[ing] consumers from being misled or confused by false or misleading labeling of agricultural products that are edible by humans." Ark. Code Ann. § 2-1-301.

However, as to *Central Hudson*'s third prong, the Court determines that Tofurky prevails on its argument that Act 501 does not "directly and materially" advance the State's asserted interest in "protect[ing] consumers from being misled or confused by false or misleading labeling of agricultural products that are edible by humans," given that the Court concludes Tofurky prevails on its argument that its speech is neither false nor misleading.  *See Greater New Orleans*, 527 U.S. at 188; Ark. Code Ann. § 2-1-301.

Similarly, as to *Central Hudson*'s fourth prong, the Court finds that Tofurky prevails on its argument that Act 501 is likely "more extensive than necessary to serve the State's interest." *Cent. Hudson*, 447 U.S. at 566.  Here, the State's sole asserted interest is preventing consumer confusion (Dkt. No. 44, at 17).  In the narrow context of an as-applied constitutional challenge, the State "must demonstrate that the harms it recites are real and that its restrictions will in fact alleviate

them to a material degree." *Miyoko's Kitchen*, 2021 WL 4497867, at *5 (quoting *Edenfield*, 507 U.S. at 770–71).

Here, the State has not made an adequate showing that the challenged provisions of Act 501 are a "reasonable fit," because the challenged provisions, which are predicated upon preventing misleading commercial speech, are outright bans on what the Court has concluded on the record before it is non-misleading commercial speech. *See e.g. Miyoko's Kitchen*, 2021 WL 4497867, at *6 (granting Miyoko's cross-motion for summary judgment enjoining the State from restricting its use of the terms "butter" "lactose free," "cruelty free," and "revolutionizing dairy with plants" on the company's "vegan butter" product labeling because the State failed to produce evidence of consumer confusion). As opposed to the prohibition in Act 501, the State could require more prominent disclosures of the vegan nature of plant-based products, create a symbol to go on the labeling and packaging of plant-based products indicating their vegan composition, or require a disclaimer that the products do not contain meat if further laws are deemed necessary to advance its stated purpose. *See Pearson v. Shalala*, 164 F.3d 650, 657 (D.C. Cir. 1999) ("[T]he Court has . . . repeatedly point[ed] to disclaimers as constitutionally preferable to outright suppression." (citing *Peel*, 496 U.S. at 110; *R. M. J.*, 455 U.S. at 206 n.20; *Shapero*, 486 U.S. at 478)).

As a final matter regarding the *Central Hudson* test, the Court restates that it typically will consider whether "it appears that the stated interests are not the actual interests served by the restriction." *Edenfield*, 507 U.S. at 768 (citing *Hogan*, 458 U.S. at 730). Here, Tofurky alleges and includes some record evidence to support that Act 501's "true purpose is not to protect consumers, but to stoke confusion in order to benefit the economic interests of the meat industry," while the State argues to the contrary (Dkt Nos. 15, at 9–10; 17, at 18–19). Because the Court finds that Tofurky demonstrates that Act 501 does not advance the stated governmental interest of

protecting consumers from being misled or confused, the Court deems it unnecessary at this time to assess whether the stated interests the Court identifies are not the actual interests served by Act 501.

For the foregoing reasons, the Court finds that Tofurky prevails on the merits of its First Amendment claim as to Arkansas Code Annotated § 2-1-305(6), (8), and (9) as applied to Tofurky.

### 3.    Other Factors

Because the Court has concluded that Tofurky has met its burden of showing actual success on the merits of its claim that Arkansas Code Annotated § 2-1-305(6), (8), and (9) are unconstitutional as-applied to Tofurky, the Court will consider the other factors for granting injunctive relief.  As noted above,  the likely absence of money damages available should the State enforce Act 501, given that the State is subject to Eleventh Amendment's sovereign immunity bar, weighs in favor of irreparable harm.  *See Entergy, Ark., Inc.*, 210 F.3d at 899 (citing *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. at 269)).

"The third *Dataphase* factor requires a district court to consider the balance between the harm to the movant and the injury that granting the injunction will inflict on other interested parties." *Sanborn Mfg. Co., Inc.*, 997 F.2d at 489 (citing *Dataphase*, 640 F.2d at 113 (footnote omitted)).  Tofurky faces substantial detrimental impact in complying with Act 501 in that it has invested significant resources in marketing and packaging its products (Dkt. No. 14-1, ¶ 11). Tofurky risks civil penalties by continuing its current marketing and packaging practices or substantial expenses to create specialized marketing and packaging practices for Arkansas, including attempting to police spillover from marketing in nearby states (*Id.*, ¶ 16).  Alternatively, Tofurky risks suffering damage from changing its marketing and packaging nationwide or refraining from marketing or selling its products in Arkansas (*Id.*).  The State, on the other hand,

has not come forward with any compelling harm that it will suffer if it is denied the ability to enforce the challenged provision of Act 501 (Dkt. No. 17, at 27).  The equities favor Tofurky.

The final factor is whether granting declaratory relief serves the public interest.  As discussed above, given that the Court has concluded that Tofurky has met its burden of showing actual success on the merits of its as-applied First Amendment challenge to Arkansas Code Annotated § 2-1-305(6), (8), and (9), the Court finds that the public interest factor weighs in favor of Tofurky.

### 4.        Permanent Injunction

Tofurky asks the Court to enjoin permanently the State from enforcing Arkansas Code Annotated § 2-1-305(6), (8), and (9) against Tofurky (Dkt. No. 31, at 15).  For the reasons set forth above, the Court grants Tofurky's request for permanent injunctive relief as to these provisions of Act 501 as applied to Tofurky (*Id.*).

### D.    First Amendment:   As Applied Challenge To Arkansas Code Annotated § 2-1-305(2) and (5)

Tofurky asserts that Arkansas Code Annotate § 2-1-305(2) and (5) are unconstitutional as applied to it because these provisions of the Act replicate provisions of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 343(b), (g) and its state analogue Arkansas Code Annotated § 20-56-209(2), (7) (Dkt. No. 43, at 15).   The State acknowledges that the Court has already preliminarily enjoined these provisions from being applied against Tofurky (Dkt. No. 44, at 20).

### 1.        Success On The Merits

The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 343 provides:

A food shall be deemed to be misbranded–

. . .

(b) If it is offered for sale under the name of another food.

. . .

(g) If it purports to be or is represented as a food for which a definition and standard of identity has been prescribed by regulations as provided by section 341 of this title, unless (1) it conforms to such definition and standard, and (2) its label bears the name of the food specified in the definition and standard, and, insofar as may be required by such regulations, the common names of optional ingredients (other than spices, flavoring, and coloring) present in such food.

21 U.S.C. § 343(b) and (g).

The State analogue to the federal statute, Arkansas Code Annotated § 20-56-209, provides:

A food shall be deemed to be misbranded:

. . .

(2) If it is offered for sale under the name of another food;

. . .

(7) If it purports to be or is represented as a food for which a definition and standard of identity has been prescribed by rules or regulations as provided by § 20-56-219 or by the Federal Food, Drug, and Cosmetic Act,[1] unless:

(A) It conforms to the definition and standard; and

(B) Its label bears the name of the food specified in the definition and standard, and, insofar as may be required by rules or regulations, the common names of optional ingredients other than spices, flavoring, and coloring present in the food. . . .

Ark. Code Ann. § 20-56-209(2), (7).

Arkansas Code Annotated § 2-1-305(2) and (5), at issue in this case, provide:

A person shall not misbrand or misrepresent an agricultural product that is edible by humans, including without limitation by:

. . .

(2) Selling the agricultural product under the name of another food;

. . .

(5) Representing the agricultural product as a food for which a definition and standard of identity has been provided by regulations under § 20-56-219 or by the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq., as it existed on January 1, 2019, unless:

(A) The agricultural product conforms to the definition and standard; and

(B) The label of the agricultural product bears the name of the food specified in the definition and standard and includes the common names of optional ingredients other than spices, flavoring, and coloring present in the food as regulations require. . . .

Ark. Code Ann. § 2-1-305(2), (5).

The existing in-effect federal and state laws identified by Tofurky that prohibit deceptive labeling and marketing of food products and consumer products more generally are nearly identical to two of the challenged provisions of the Act at issue, Arkansas Code Annotated § 2-1-305(2) and (5). As set forth above, based on the record before it, the Court concludes that Tofurky's labels are not deceptive or misleading. Further, the in effect federal and state laws identified by Tofurky have not been enforced against Tofurky's labels based on the record evidence before the Court (Dkt. Nos. 31, ¶¶ 21–33; 15, at 11–12). Consequently, the Court concludes, based on the record before it, that Tofurky has met its burden of establishing that Arkansas Code Annotated § 2-1-305(2) and (5) are unconstitutional as applied to Tofurky's labels. *See Miyoko's Kitchen*, 2021 WL 4497867, at *1, *7 (granting Miyoko's cross-motion for summary judgment enjoining the State from restricting its use of the terms "butter," "lactose free," "cruelty free," and "revolutionizing dairy with plants" on its product labeling under 21 U.S.C. § 343 and its state analogue).

## 2.    Other Factors

Because the Court has concluded that Tofurky has met its burden of showing actual success on the merits of it claim that Arkansas Code Annotated § 2-1-305(2) and (5) are unconstitutional

as-applied to Tofurky, the Court will consider the other factors for granting injunctive relief.  As noted above, the likely absence of money damages available should the State enforce Act 501 given that the State is subject to Eleventh Amendment's sovereign immunity bar weighs in favor of irreparable harm.  *See Entergy, Ark., Inc.*, 210 F.3d at 899 (citing *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. at 269 (1997)).

"The third *Dataphase* factor requires a district court to consider the balance between the harm to the movant and the injury that granting the injunction will inflict on other interested parties." *Sanborn Mfg. Co., Inc.*, 997 F.2d at 489 (citing *Dataphase*, 640 F.2d at 113 (footnote omitted)).  Tofurky faces substantial detrimental impact in complying with Act 501 in that it has invested significant resources in marketing and packaging its products (Dkt. No. 14-1, ¶ 11).  Tofurky risks civil penalties by continuing its current marketing and packaging practices or substantial expenses to create specialized marketing and packaging practices for Arkansas, including attempting to police spillover from marketing in nearby states (*Id.*, ¶ 16).  Alternatively, Tofurky also risks suffering damages if it changes its marketing and packaging nationwide or refrains from marketing or selling its products in Arkansas (*Id.*).  The State, on the other hand, has not come forward with any compelling harm that it will suffer if it is denied the ability to enforce the challenged provision of Act 501 (Dkt. No. 17, at 27).  The equities favor Tofurky.

The final factor is whether granting declaratory relief serves the public interest.  As discussed above, given that the Court has concluded that Tofurky has met its burden of showing actual success on the merits of its as-applied First Amendment challenge to Arkansas Code Annotated § 2-1-305(2) and (5), the Court finds that the public interest factor weighs in favor of Tofurky.

### 3.        Permanent Injunction

Tofurky asks the Court to enjoin permanently the State from enforcing Arkansas Code Annotated § 2-1-305(2) and (5) against Tofurky with respect to the labels in the record and similar materials (Dkt. No. 43, at 15).  For the reasons set forth above, the Court grants Tofurky's request for permanent injunctive relief as to these provisions of Act 501 as applied to the labels in the record and similar materials of Tofurky.

### E.      First Amendment:  Facial Challenge

### 1.        Success On The Merits:  Standard

Tofurky brings a facial First Amendment challenge as to Arkansas Code Annotated § 2-1-305(6), (8), (9), and (10) (Dkt. No. 43, at 4–10).  The State contends that the bulk of Tofurky's argument is that Arkansas Code Annotated § 2-1-305(6), (8), (9), and (10) are overbroad encompassing protected commercial speech of other individuals or entities not parties to this action (Dkt. No. 44, at 11).  The State urges the Court to reject Tofurky's facial overbreadth challenge.

The State points to the Court's preliminary injunction Order wherein the Court cited *Central Hudson* and stated, "whether Act 501 has an overbroad scope encompassing protected commercial speech of other persons is irrelevant because the overbreadth doctrine does not apply to commercial speech." (Dkt. No. 25, at 16 (citing 447 U.S. 557, 565 n.8 (1980))).  The State argues, based on this statement in the Court's preliminary injunction Order, that the Court should reject Tofurky's argument that commercial speech restrictions can be facially invalidated based on the overbreadth doctrine here because this is commercial speech (Dkt. No. 44, at 11–12 (citing *Vill. of Hoffman Estates*, 455 U.S. at 496–497 (1982))).  After reviewing further *Central Hudson*, reviewing the caselaw cited by Tofurky in its supplemental brief, reviewing all parties' filings, and reviewing the record before the Court, the Court rejects the State's argument.

40

Tofurky acknowledges that the United States Supreme Court has held that the overbreadth doctrine does not generally apply to claims of commercial speech (Dkt. No. 43, at 4). *See Cent. Hudson*, 447 U.S. at 565 n.8. However, Tofurky asserts that "[t]his means that a plaintiff who has 'engaged in no constitutionally protected activity' may not invoke the First Amendment interests of third parties 'not before the court' in order to challenge the statute's facial validity." (Dkt. No. 43, at 4 (quoting *Cent. Hudson*, 447 U.S. at 565 n.8)). Tofurky contends that under controlling law restrictions on commercial speech may be challenged facially by a plaintiff whose own constitutionally protected speech is prohibited (*Id.* (citing *Cent. Hudson*, 477 U.S. at 565 n.8)).

As set forth in the Court's preliminary injunction Order, the United States Supreme Court has held generally that the overbreadth doctrine does not apply to commercial speech. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 565 n.8 (1980). The Supreme Court has explained, however, that a plaintiff who has "engaged in no constitutionally protected activity" may not invoke the First Amendment interests of third parties "not before the court" in order to challenge a statute's facial validity. *Id.*; *see, e.g., Bates v. State Bar of Ariz.*, 433 U.S. 350, 380 (1970) ("The First Amendment overbreadth doctrine, however, represents a departure from the traditional rule that a person may not challenge a statute on the ground that it might be applied unconstitutionally in circumstances other than those before the court."). The Supreme Court has, however, permitted facial challenges to restrictions on commercial speech by a plaintiff whose own constitutionally protected speech is prohibited. *See Cent. Hudson*, 447 U.S. at 565 n.8 ("In this case, the Commission's prohibition acts directly against the promotional activities of Central Hudson, and to the extent the limitations are unnecessary to serve the State's interest, they are invalid."). Here, the facial challenge to restrictions on commercial speech arises from Tofurky,

who has engaged in speech that is restricted by the challenged provisions of Act 501 for the reasons the Court explains in analyzing Tofurky's as-applied challenges.

Additionally, as Tofurky notes, the United States Supreme Court, the Eighth Circuit, and other circuits have applied *Central Hudson* in circumstances involving facial challenges to commercial speech restrictions like the challenge Tofurky brings here.  For example, in *Thompson v. Western States Medical Center*, the Supreme Court noted that the parties agreed to the application of *Central Hudson*, and the Court applied *Central Hudson* to uphold the Ninth Circuit's decision to strike down provisions of the Food and Drug Administration Modernization Act that prohibited advertising and promoting particular compounded drugs.  535 U.S. 357, 367 (2002)

In *Lorillard Tobacco Co. v. Reilly*, the petitioners, manufacturers, and sellers of cigarettes, smokeless tobacco products, and cigars urged the Supreme Court to reject the *Central Hudson* analysis and apply strict scrutiny.  533 U.S. 525, 554–555 (2001).  The Supreme Court rejected the invitation to break new ground and instead applied the *Central Hudson* analysis to strike down a regulation restricting outdoor and point-of-sale advertising for smokeless tobacco and cigars under *Central Hudson's* third and fourth prong.  *Lorillard*, 533 U.S. at 554–555, 561–562, 565–567.

In *Missouri Broadcasters Association v. Lacy*, the Eighth Circuit Court of Appeals applied *Central Hudson* to reverse a district court's grant of a motion to dismiss in a case where an association of broadcasters, a corporate operator of radio stations, a winery, and a commercial food and drink establishment licensed to sell alcohol brought a facial challenge under the First Amendment to a statute and two regulations of the State of Missouri that detailed the information alcohol manufacturers, wholesalers, distributers, and retailers could include in their advertisements.  846 F.3d 295, 300–303 (8th Cir. 2017).

42

The State does not address Tofurky's argument that restrictions on commercial speech may be challenged facially by a plaintiff whose own constitutionally protected speech is prohibited. Moreover, the State does not address the cases cited by Tofurky where the Supreme Court, the Eighth Circuit, and other circuits have applied *Central Hudson* in cases presenting facial challenges to commercial speech restrictions. Accordingly, the Court concludes that Tofurky may pursue a facial, First Amendment overbreadth challenge to Act 501. The Court also concludes that the *Central Hudson* test applies.

## 2.     Success On The Merits:  Analysis

As the Court previously explained, both parties agree that the speech restricted by the challenged provisions is commercial speech, but the parties disagree as to whether that commercial speech is inherently misleading. Tofurky argues that the State may not place an absolute prohibition on speech that is potentially misleading if the information may also be presented in a way that is not deceptive (Dkt. No. 43, at 6). Tofurky points to the Court's finding in the preliminary injunction Order that, "the simple use of a word frequently used in relation to animal-based meats does not make use of that word in a different context inherently misleading" especially when the labels and advertisements include appropriate "disclosures to inform consumers as to the plant-based nature of the products contained therein." (Dkt. Nos. 43, at 7; 25, at 23). Tofurky argues that because the information may be presented in a way that is not misleading, like the Tofurky labels reviewed by the Court, it is not inherently misleading and may not be categorically proscribed (Dkt. No. 43, at 7 (citing *Allstate Ins. Co.*, 495 F.3d 151, 166–168 (5th Cir. 2007)).

The State argues that Act 501 restricts inherently misleading speech. The State contends that marketing plant-based products designed to feel, taste, and look like traditional meat products is inherently confusing. Further, the State contends that Tofurky's facial challenge relies too much

on its own labeling practices (Dkt. No. 44, at 13).  In this regard, the State argues that "not all purveyors of plant-based products will include those identifying terms [such as 'all vegan'] to differentiate their products from traditional meat-based products" on their labels (Dkt. No. 44, at 14).

The State also argues that issues related to labeling, including excluding products from the Act's coverage that include identifying terms on labels such as "plant-based" and otherwise, could be accomplished through the promulgation of regulations and that facially invalidating the statute deprives the State of the opportunity to assuage many of these concerns (Dkt. No. 44, at 14-15). The State points to *Turtle Island Foods, SPC v. Richardson*, 425 F. Supp. 3d 1131 (W.D. Mo. 2019), *aff'd sub nom. Turtle Island Foods SPC v. Thompson*, 992 F.3d 694 (8th Cir. 2021).  In *Richardson*, the United States District Court for the Western District of Missouri considered a case brought by Tofurky and the Good Food Institute challenging a Missouri statute the State claims is similar, but the record indicates is not identical, to the one at issue in this case that prohibits a person from "misrepresenting a product as meat that is not derived from harvested production livestock or poultry."  425 F. Supp. 3d at 1134.  The term "misrepresent" in the Missouri statute is defined as "the use of any untrue, misleading or deceptive oral or written statement, advertisement, label, display, picture, illustration or sample."  *Id*.  Pursuant to the Missouri statute, any person who violates any portion of the statute is guilty of a class A misdemeanor.  *Id*. Punishment for a class A misdemeanor in Missouri is subject to imprisonment for up to one year and a fine of up to $1,000.  *Id*.

The packaging and labels at issue in *Richardson* are similar to the Tofurky labels presented in this case and involve use of the terms "slow-roasted chick'n," "smoked ham style deli slices," "veggie burger," "hot dogs," "sausage," "DIY chorizo," and "ham roast."  *Id*. at 1135.  Missouri

44

did not argue, in *Richardson*, that plaintiffs "misrepresent" their products as meat.  In Missouri, two days after the statute at issue took effect, the Missouri Department of Agriculture issued guidance on the statute.  *Thompson*, 992 F.3d at 697.  The guidance explained that the Missouri Department of Agriculture "would not refer for prosecution products in packaging fulfilling two conditions:  (1) prominent statements on the front of the package implying the product is 'plant-based,' 'veggie,' 'lab-grown,' 'lab-created,' or employing a similar qualifier; and (2) a prominent statement anywhere on the package that the product is 'made from plants,' 'grown in a lab,' or a comparable disclosure."  *Id.* at 697–98.  Missouri argued that the use of the word "meat" on a plant-based or lab-grown product would only violate the statute if it lacked an appropriate qualifier "plant-based," "veggie," "lab-grown," "lab-created."  *Richardson*, 425 F. Supp. 3d at 1139.  The district court granted plaintiffs' motion to certify a class and denied plaintiffs' motion for preliminary injunction concluding that plaintiffs had not shown a substantial likelihood of success on the merits of their First Amendment claim because the plaintiffs had not shown that the statute prohibited their commercial speech.  *Id.* at 1140.  In *dicta*, the district court appeared to agree with the state's argument that, if a company's label did not identify that the product was plant-based or lab-grown when it in fact was, "the statute would unquestionably be valid," and plaintiffs would be "unlikely to succeed on a facial challenge to the statute."  *Id.*

The Court of Appeals for the Eighth Circuit affirmed the district court's denial of preliminary injunctive relief.  *Thompson*, 992 F.3d at 702.  Applying the test set forth in *Central Hudson*, the Court of Appeals concluded that, on the record before the district court, plaintiffs were not likely to prevail on the merits of their as-applied First Amendment challenge because their intended speech was not likely to be seen as "'misrepresenting a product as meat' and therefore did not fall within the scope of the Statute."  *Id.* at 701.  The Court of Appeals stated,

"Plaintiffs' as-applied challenge is impeded by the fact that there is a significant doubt surrounding whether the Statute would ever, or could ever, be applied to their speech.  The burden is on Plaintiffs to demonstrate they are likely to succeed on the merits of their as-applied First Amendment claim, which includes explaining how the Statue applies to their current and intended commercial speech."  *Id*.

The State's reliance on the Missouri case seems misplaced.  Having studied the Missouri case, this Court observes that this statement by the Court of Appeals may derive from the regulations, Missouri's position in the litigation, or from the language of the Missouri statute itself, which as the dissent noted likely did not apply to plaintiffs.  *Id.* at 702 (Colloton, J., dissenting) (concluding "the challenged Missouri statute applies only to a 'person advertising, offering for sale or selling all or part of a carcass or food plan.' Mo. Rev. Stat. § 265.494.  Neither plaintiff is such a person, so the statute does not apply.").  All of these facts are absent from the current litigation.  The State has promulgated no regulations during the three years this dispute has been pending.  The State has not taken the position in this litigation that Act 501 does not apply to Tofurky.  The State has not taken the position in this litigation that Tofurky's speech is not misleading, and the State offers no explanation for how the plain language of Act 501 could be read to exclude Tofurky.

While here the Court found at the preliminary injunction stage that Tofurky's labels were not misleading, that finding resulted from a review of the labels as a whole applying a reasonable consumer standing and derived in part from qualifiers such as "all vegan," "veggie," and "vegetarian" on Tofurky's packaging.  The Court determines that Tofurky cannot rely on its labels to establish that no set of circumstances exists under which Act 501 would be valid in the context of a facial challenge.  *See Salerno*, 481 U.S. at 745.  The Court can envision plant-based products

46

offered by other purveyors in Arkansas with labels subject to Act 501 and without qualifiers on their packaging identifying the products as "plant-based" or "vegan."  The Court cannot find on the record before it that such speech in every case would not inevitably be misleading to consumers.  *Otto*, 744 F.3d at 1062.  In such a case, the provisions of Act 501 Tofurky facially challenges might be valid.  The Court concludes that Tofurky has failed to establish that it will be successful in establishing that Arkansas Code Annotated § 2-1-305(6), (8), (9), and (10) concerns speech that is not misleading in all cases.  Tofurky has not established the first prong of the *Central Hudson* test with respect to all cases.  Accordingly, the Court concludes that Tofurky has not met its burden to establish success on the merits of its facial First Amendment challenge to Arkansas Code Annotated § 2-1-305(6), (8), (9), and (10).

### 3.    The Other Factors

Having found that Tofurky has not met its burden of showing success on the merits of its facial First Amendment challenge to Arkansas Code Annotated § 2-1-305 (6), (8), (9), and (10), the Court finds it unnecessary to assess the remaining factors required to grant Tofurky permanent injunctive relief as to these specific provisions on Tofurky's facial First Amendment claim.  *See Oglala Sioux Tribe*, 542 F.3d at 233 (citing *Planned Parenthood Minn., N.D., S.D. v. Rounds,* 530 F.3d 724, 732 (8th Cir. 2008) (en banc)).  The Court denies Tofurky's request for statewide permanent injunctive relief on its facial First Amendment claim.

### F.    Due Process:  Void-For-Vagueness

Tofurky asks the Court to declare that Arkansas Code Annotated § 2-1-305(10) facially violates the Fourteenth Amendment's Due Process Clause, and Tofurky requests that the Court permanently enjoin the State from enforcing the provision.  The Court will consider whether Tofurky is successful on its facial Due Process claim.

### 1.    Success On The Merits:  Legal Standard

"The void-for-vagueness doctrine is embodied in the due process clauses of the fifth and fourteenth amendments."  *D.C. v. City of St. Louis*, 795 F.2d 652, 653 (8th Cir. 1986) (citing *Postscript Enters., Inc. v. Whaley*, 658 F.2d 1249 (8th Cir. 1981)).  "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  Under the vagueness doctrine, "a law is unconstitutional if it 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'"  *Musser v. Mapes*, 718 F.3d 996, 1000 (8th Cir. 2013) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).  A law can also be impermissibly vague "if it authorizes or even encourages arbitrary and discriminatory enforcement."  *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *City of Chicago v. Morales*, 527 U.S. 41, 56–67 (1999)).  To overcome a vagueness challenge, a court should find it "clear what the ordinance as a whole prohibits."  *Grayned*, 408 U.S. at 110.

"The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment. Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action."  *Vill. of Hoffman Estates*, 455 U.S. at 498.  Additionally, courts have "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."  *Id*. at 498–499.  "[A] scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed."  *Id*. at

499.  "[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights.  If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply."  *Id*.

### 2.     Success On The Merits:  Analysis

Tofurky asserts that Arkansas Code Annotated § 2-1-305(10) facially violates the Due Process clause.  Tofurky contends that Act 501's civil penalties are "quasi-criminal in nature" given the "devastating reputational and financial consequences they threaten to impose against offending entities." (Dkt. No. 43, at 11 (citing *Vill. of Hoffman Estates*, 455 U.S. at 499 and n.16 (stating that "prohibitory and stigmatizing effect" of civil penalties is "quasi-criminal" in nature and "may warrant a relatively strict test"))).  Tofurky also argues that, although the State is authorized to waive civil penalties if it concludes that the violation was "accidental, erroneous, or unintentional," scienter is not a necessary element of the offense.  *Id*.  Finally, Tofurky asserts that the Act restricts constitutionally protected commercial speech, so the Court should apply a stricter vagueness test.

The provision at issue provides that "[a] person shall not misbrand or misrepresent an agricultural product that is edible by humans, including without limitation, by . . . (10) Utilizing a term that is the same as or similar to a term that has been used or defined historically in reference to a specific agricultural product."  Ark. Code Ann. § 2-1-305(10).  Tofurky argues that many food-related terms have long applied to a wide variety of agricultural products, including products made from slaughtered animals and products made from plants.  Tofurky points out that the Act defines "meat" as "a portion of livestock, poultry, or cervid carcass that is edible by humans," Arkansas Code Annotated § 2-1-302(7)(A), but in other sources, including the King James Bible

and the Federal Drug Administration's guidance documents, the word "meat" is also used to refer to the flesh of fruits or nuts (Dkt. No. 15, at 13–14).  Tofurky maintains that the word "burger" traditionally referred to a sandwich made from a patty of ground beef, but since the 1930s, "burger" has been used to describe all sorts of sandwiches, including nut burgers, fish burgers, turkey burgers, and veggie burgers (*Id.*, at 14).  Additionally, Tofurky asserts that the word "steak" can refer to a slice of meat cut from a beef carcass or to edible portions of other animals or non-animal food (*Id.*).  Tofurky questions whether this provision would regulate terms such as peanut butter, oat milk, buffalo wings, and beetballs (Dkt. No. 43, at 12).  Tofurky contends that, regardless of the level of scrutiny applied, it is not clear to a manufacturer or distributor of ordinary intelligence what the statute prohibits (*Id.*).

The State argues that considering the Act as a whole, it is "plain what Act 501 regulates." (Dkt. No. 44, at 19).  The State asserts that the Act defines and provides examples of what constitutes "beef," "beef product," livestock," "pork," "pork product," "poultry," and other key provisions.  Ark. Code Ann. § 2-1-302.  The State also contends that the Act identifies the specific activities regulated by the Act.  Ark. Code Ann. § 2-1-305.  The State maintains that Tofurky's focus on a single provision of the Act ignores the specific, plain provisions set forth in the remainder of the Act that establish what the Act prohibits.  The State argues that, if the Court finds this provision of the Act unconstitutionally vague, however, that it should not enjoin the entire statute because the Act provides for severability of any provision of the Act deemed invalid (Dkt. Nos. 44, at 19-20; 17-1, at 5).

The State has not come forward with arguments that address what is meant by "same as or similar to a term that has been used or defined historically in reference to a specific agricultural product."  Ark. Code Ann. § 2-1-305(10).  While the State is correct that the Act in general has

defined some terms, as Tofurky points out there are many other terms for "agricultural product[s]" left undefined by the statute which have been used or defined historically in multiple ways including, but not limited to, meat, milk, patty, buffalo, steak, and butter.  The Court concludes that Tofurky succeeds on the merits of its claim that Arkansas Code Annotated § 2-1-305(10) is facially void for vagueness.  *See Grocery Mfrs. Ass'n v. Sorrell*, 102 F. Supp. 3d 583, 644–645 (D. Vt. 2015) (concluding that plaintiffs were likely to succeed on their facial challenge to Vermont statue's restriction of the word "natural" and "any words of similar import" because the statute "fails to provide 'fair notice of what is prohibited'" and "[i]t will therefore permit arbitrary and irrational enforcement as it provides no meaningful standard for determining which words will trigger liability.") (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)) (citing *Humanitarian Law Project*, 561 U.S. 1, 18 (2015)) (other citations omitted)), *appeal dismissed per stipulation*, 2016 WL 11785969, *1 (2d Cir. Aug. 5, 2016).

### 3.    Other Factors

Because the Court has concluded that Tofurky has met its burden of showing actual success on the merits of it claim that Arkansas Code Annotated § 2-1-305(10) is facially void for vagueness, the Court will consider the other factors for granting injunctive relief.  As noted above, the likely absence of money damages available should the State enforce Act 501, given that the State is subject to Eleventh Amendment's sovereign immunity bar, weighs in favor of irreparable harm.  *See Entergy, Ark., Inc.*, 210 F.3d at 899 (citing *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. at 269)).

"The third *Dataphase* factor requires a district court to consider the balance between the harm to the movant and the injury that granting the injunction will inflict on other interested parties."  *Sanborn Mfg. Co., Inc.*, 997 F.2d at 489 (citing *Dataphase*, 640 F.2d at 113 (footnote

omitted)).  Tofurky faces substantial detrimental impact in complying with Act 501 in that it has invested significant resources in marketing and packaging its products (Dkt. No. 14-1, ¶ 11). Tofurky risks civil penalties by continuing its current marketing and packaging practices or substantial expenses to create specialized marketing and packaging practices for Arkansas, including attempting to police spillover from marketing in nearby states (*Id.*, ¶ 16).  Alternatively, Tofurky risks suffering damage from changing its marketing and packaging nationwide or refraining from marketing or selling its products in Arkansas (*Id.*).  The State, on the other hand, has not come forward with any compelling harm that it will suffer if it is denied the ability to enforce the challenged provision of Act 501 (Dkt. No. 17, at 27).  The equities favor Tofurky.

The final factor is whether granting declaratory relief serves the public interest.  As discussed above, given that the Court has concluded that Tofurky has met its burden of showing actual success on the merits of it claim that Arkansas Code Annotated § 2-1-305(10) is facially void for vagueness, the Court finds that the public interest factor weighs in favor of Tofurky.

### 4.      Permanent Injunction

Tofurky seeks permanent injunctive relief (Dkt. No. 43, at 12-14).  Tofurky argues that, "[b]ecause the challenged provision [is] facially unconstitutional, [it] should be enjoined statewide." (*Id.*, at 14).  The Act provides that, "[i]f any provision of this act or the application of this act to any person or circumstance is held invalid, the invalidity shall not affect the other provisions or application of this act which can be given effect without the invalid provision or application, and to this end, the provisions of this act are declared severable." (Dkt. No. 17-1, at 5).  When confronting a constitutional flaw in a statute, a federal court must "try not to nullify more of a legislature's work than is necessary."  *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006).  It is preferable "to enjoin only the unconstitutional applications of a

statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact." 546 U.S. at 329 (citations omitted).

Severability is a matter of state law. *See Russell v. Burris*, 146 F.3d 563, 573 (8th Cir. 1998). Under Arkansas law, "an act may be unconstitutional in part and yet be valid as to the remainder." *Ex Parte Levy*, 163 S.W.2d 529 (Ark. 1942). In determining whether a constitutionally invalid portion of a legislative enactment is fatal to the entire legislation, the Supreme Court of Arkansas looks to: "(1) whether a single purpose is meant to be accomplished by the act; and (2) whether the sections of the act are interrelated and dependent upon each other." *U.S. Term Limits, Inc. v. Hill*, 872 S.W.2d 349, 357 (Ark. 1994). Applying this standard, the Court satisfies itself that voiding for vagueness one provision of Act 501 is acceptable.

Because the Court has concluded that only one of the challenged provisions is facially unconstitutional and because the Court has concluded that it is severable, the Court grants permanent statewide injunctive relief as to Arkansas Code Annotated § 2-1-305(10), which the Court has found facially void for vagueness under the Due Process Clause of the Fourteenth Amendment.

**VI.    Conclusion**

For the foregoing reasons, the Court hereby orders that defendant Nikhil Soman, in his official capacity as Director of the Arkansas Bureau of Standards, and all those acting in concert with him, including employees, agents, and successors in office, are permanently enjoined:

(1) From enforcing Arkansas Code Annotated § 2-1-305(10) statewide. The Court declares that Arkansas Code Annotated § 2-1-305(10) is facially unconstitutional.

(2) From enforcing Arkansas Code Annotated § 2-1-305(6), (8), and (9) against Tofurky.

(3)  From enforcing Arkansas Code Annotated § 2-1-305(2) and (5) against Tofurky's

labels in the record and similar materials of Tofurky.

It is so ordered this 30th day of September, 2022.


Kristine G. Baker
United States District Judge